**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Anthony LaPIERRE, Defendant–Appellant.**

**No. 92–10321.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 1993.

Decided July 12, 1993.

As Amended Aug. 19, 1993.

Richard Ney, Federal Public Defender, Honolulu, HI, for defendant-appellant.

Edward H. Kubo, Jr. and Marshall Silverberg, Asst. U.S. Attys., Honolulu, HI, for plaintiff-appellee.

Before NORRIS, HALL, and FERNANDEZ, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

Appellant Anthony LaPierre challenges his bank robbery and firearm convictions[1] and contends that the district court erred in 1) failing to suppress his lineup identification, 2) allowing a police officer to testify that he was the individual pictured in the bank surveillance photos, 3) failing to sever counts, 4) failing to suppress his post-arrest state-

---

1. LaPierre was convicted after a jury trial of 3 counts of bank robbery (18 U.S.C. § 2113(a)), one count of using and carrying a firearm in the course of committing a bank robbery (18 U.S.C. § 924(c)(1)), and one count of being a felon in possession of a firearm (18 U.S.C. § 922(g)(1)).

ments, and 5) failing to grant him a reduction for acceptance of responsibility because he planned to appeal his conviction. We vacate and remand.

## I

LaPierre claims that he was denied his Sixth Amendment right to counsel because his counsel was not present for the entire post-charge lineup, at which three witnesses identified him. The district court denied La-Pierre's motion to suppress the lineup identification. We hold that the lineup procedure in this case proceeded in violation of *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

## A

LaPierre's lineup was scheduled for 1:00 p.m. on August 2, 1991. His attorney, Assistant Federal Public Defender Bernie Bervar, arrived at the Honolulu Police Department at approximately 12:45 p.m., and was accompanied by Charles Rose, an investigator with the Public Defender's office. Upon arrival, Bervar told FBI agent Bernal Reneer that he was there for the LaPierre lineup, and asked Reneer where the lineup was going to be held. Reneer responded that he did not know, but indicated that Bervar and Rose could wait on a bench outside the hallway leading to the lineup room. Bervar and Rose did so.

The lineup was delayed and did not begin exactly at 1:00. Some time after 1:00, Reneer escorted LaPierre from the cell block to the lineup room. While transferring the appellant, Reneer saw Bervar and acknowledged his presence. Shortly thereafter, FBI agents Roger Kent and John Pikus entered the lineup room with the witnesses. Kent and Pikus were aware that Bervar was waiting for the lineup outside the room. Inside the lineup room, the six members of the lineup stood on one side of the one-way window, while the witnesses gathered on the other side, in the viewing area. The presentation began, and the first lineup member stepped forward for inspection. At some point during the presentation of the first two lineup members, Agent Pikus noticed that counsel Bervar was not in the viewing area.

Pikus left the room to get Bervar, and the two returned while the third lineup member was being presented. LaPierre was the fourth member of the lineup. Bervar was present for the rest of the lineup, including the presentation of LaPierre.

## B

■ LaPierre contends that this lineup procedure violated his Sixth Amendment right to counsel. The rule governing post-charge lineups is quite simple. The post-charge lineup is a critical stage of the prosecution at which the defendant has the right to counsel. *Wade,* 388 U.S. at 236–37, 87 S.Ct. at 1937; *Kirby v. Illinois,* 406 U.S. 682, 689–90, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972). Once the government has initiated "adversary judicial criminal proceedings," *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882, counsel's presence is "a requisite to conduct of the lineup." *Wade,* 388 U.S. at 237, 87 S.Ct. at 1937.

■ Notwithstanding this straightforward mandate, the district court concluded, and the government argues on appeal, that the requirement that counsel be present does not apply to this case. The government first argues that Bervar's absence was merely an oversight, and that the government did not act in bad faith. The requirement that counsel be present during a post-charge lineup, however, has never turned on a showing of government bad faith, or even government error. The government has an affirmative obligation to ensure counsel's presence at the lineup. In this case, the government failed to meet that obligation.

■ Bervar presented himself at the police station, identified himself as LaPierre's attorney, said he was present for the lineup, and told the government where he would be waiting. This was all he was required to do. Bervar waited where he did because a sign on the door to the lineup room said that only authorized personnel could enter. According to Bervar, "I didn't feel that I had the authority to interject myself ... between the FBI and their witnesses or go wandering around the police station any more than I

would go wandering around the back rooms of the FBI."[2] Bervar made a reasonable professional judgment, and neither he nor his client can be made to shoulder the responsibility for the government's decision to begin the lineup proceeding in counsel's absence.

■ The government's second argument is that LaPierre's right to counsel was not violated because LaPierre's attorney was present at the moment LaPierre stepped forward for presentation. The right to counsel, however, includes the right to have counsel present for the entire lineup presentation. While we recently declined to decide whether the witness preparation stage triggers the right to counsel, *Jordan v. Ducharme*, 983 F.2d 933, 937 (9th Cir.1993), we have never held that the right to counsel does not attach until the moment the suspect steps forward for inspection. To the contrary, even the cases reading the right to counsel most narrowly have held that the right attaches to the period "during which an accused is within sight of a potential identification witness." *United States v. Cunningham*, 423 F.2d 1269, 1274 n. 3 (4th Cir.1970). In this case, the witnesses viewed the lineup as a whole, meaning that from the very beginning LaPierre was within view of the witnesses. LaPierre's right to counsel attached at the moment he and the other lineup members were within the sight of the witnesses.

■ Finally, the government points out that this lineup was videotaped. The government argues that the videotape eliminates the need for a per se rule, because the court can scrutinize the lineup and identify any impropriety. Without deciding whether a videotape can ever substitute for the presence of counsel, we conclude that in this case the videotape is an inadequate substitute. This videotape shows only the lineup members. It does not record anything that occurred in the witness room. Accordingly,

the videotape does not respond to all of the concerns that caused *Wade* to establish a bright line rule requiring counsel's presence. *Wade*, 388 U.S. at 233, 87 S.Ct. at 1935 (expressing concern that somebody in the witness room might point out the suspect before or during the lineup).

There is no reason not to apply *Wade*'s bright line rule to this case. We hold that counsel's absence from a portion of the lineup violated LaPierre's right to have counsel present at this critical stage of the prosecution.

## C

■ At trial, three prosecution witnesses testified that they had been present at the lineup. Each made an in-court identification of LaPierre and each testified that she had previously identified LaPierre at the lineup. These two lines of testimony raise slightly different concerns. We first address the in-court identifications. We cannot grant LaPierre a new trial without first "giving the Government the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." *Wade*, 388 U.S. at 240, 87 S.Ct. at 1939. Although there is some evidence in the record that the in-court identifications may have been tainted by the improper lineup,[3] we vacate the convictions pending a hearing in the district court to determine whether the in-court identifications had an independent origin. *See id.* at 242, 87 S.Ct. at 1940.

■ Unlike the in-court identification, there is no question that the witnesses' in-court testimony that they had previously identified LaPierre at the lineup "is the direct result of the illegal lineup.... The [government] is therefore not entitled to an

2. We recently considered a case in which a defense attorney entered the lineup room without invitation. She was removed by a police sergeant who explained, "On this particular occasion an attorney surprised me by sneaking into the room, is what I felt was going on. And I didn't appreciate it so I asked the attorney to leave." *Jordan v. Ducharme*, 983 F.2d 933, 935 (9th Cir.1993).

3. According to one witness, an FBI agent told her at the post lineup interview that she had "picked the right one." Another said that an agent told her that she "did good." Such post-lineup commentary is highly suggestive and improper.

opportunity to show that the testimony had an independent source." *Gilbert v. California,* 388 U.S. 263, 272–73, 87 S.Ct. 1951, 1956–57, 18 L.Ed.2d 1178 (1967). Although this testimony is per se inadmissible, the government will be given an opportunity to show that the testimony was harmless beyond a reasonable doubt. *See id.* at 274, 87 S.Ct. at 1957.

## II

At trial the police officer (Officer Miller) who investigated the bank robberies gave lay opinion testimony that LaPierre was the individual pictured in the bank surveillance photographs. LaPierre claims that the district court abused its discretion in allowing Miller's testimony.[4] We agree.

Lay opinion testimony of the type given by Miller is of dubious value. The jury, after all, was able to view the surveillance photos of LaPierre and make an independent determination whether it believed that the individual pictured in the photos was in fact LaPierre. Miller's testimony therefore ran the risk of invading the province of the jury and unfairly prejudicing LaPierre. For these reasons we have held that while lay opinion testimony of this sort is sometimes permissible, "the use of lay opinion identification by policemen or parole officers is not to be encouraged, and should be used only if no other adequate identification testimony is available to the prosecution." *United States v. Butcher,* 557 F.2d 666, 670 (9th Cir.1977). Our cases upholding the use of testimony of this type have been limited to two types. The first type is those in which the witness has had substantial and sustained contact with the person in the photograph. *United States v. Langford,* 802 F.2d 1176, 1178–79 (9th Cir.1986) (one witness had met with defendant over 50 times and another had known him most of his life); *United States v. Barrett,* 703 F.2d 1076, 1085–86 (9th Cir. 1983) (witness was defendant's girlfriend). The second type is those in which the defendant's appearance in the photograph is different from his appearance before the jury

and the witness is familiar with the defendant as he appears in the photograph. *Barrett,* 703 F.2d at 1086 (defendant had a full beard and mustache at time of the robbery but was clean-shaven at trial); *United States v. Saniti,* 604 F.2d 603, 604–05 (9th Cir.1979) (witnesses knew defendant well and were familiar with defendant's clothing, which defendant was wearing in photo but not wearing before the jury). The common thread binding these two types of cases is that in both there is reason to believe that the witness is more likely to identify correctly the person than is the jury.

The case at hand, however, is far different. There was no evidence that LaPierre's courtroom appearance and his appearance at the time of the robbery were significantly different. Moreover, Miller not only did not know LaPierre, he had never even seen him in person. Miller's knowledge of LaPierre's appearance was based entirely on his review of photographs of LaPierre and witnesses' descriptions of him. We can perhaps imagine a hypothetical scenario in which a witness who knew a defendant only through photographs nonetheless had become sufficiently familiar with his appearance to give lay opinion testimony of this sort. But this is not such a case. Miller's level of familiarity with LaPierre's appearance falls far short of that required by our cases and by Rule 701's requirement of helpfulness. Whether the person sitting before the jury was the one pictured in the surveillance photographs was a determination properly left to the jury.

We cannot determine at this time whether Officer Miller's testimony was harmless. Because we have remanded the lineup identification issue to the district court, the harmless error analysis must wait until the district court determines precisely what portion, if any, of the in-court identifications should have been excluded.

## III

Next we consider LaPierre's claim that the district court erred in failing to

4. Federal Rule of Evidence 701 provides that lay opinion testimony is limited to "those opinions or inferences which are (a) rationally based on

the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

sever counts.[5] LaPierre argues that he wanted to testify on some counts but not on others and that joinder forced him to choose between his right to testify and his right against self-incrimination. To be successful on this claim, however, LaPierre must demonstrate that "he has important testimony to give concerning some counts and a strong need to refrain from testifying on others." *United States v. Whitworth,* 856 F.2d 1268, 1277 (9th Cir.1988). LaPierre has failed to make this showing.

## IV

■■■ We next consider LaPierre's claim that his post-arrest statements should have been suppressed. LaPierre objects to the introduction of two statements he made before he had been given his *Miranda* warning. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is not disputed that LaPierre was in "custody" for *Miranda* purposes—he was arrested and was being held by police in a hotel room. The only issue here is whether he was being "interrogated." In determining whether a suspect was being interrogated, the critical inquiry is whether "[i]n light of both the context of the questioning and the content of the question," *United States v. Disla,* 805 F.2d 1340, 1347 (9th Cir.1986), the statements made by the officers were of the sort that "the police should know [are] reasonably likely to evoke an incriminating response...." *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1690, 64

L.Ed.2d 297 (1980). We will reverse the district court's determination that LaPierre was not being interrogated only if the determination is clearly erroneous. *United States v. Booth,* 669 F.2d 1231, 1238 (9th Cir.1981).

■■ LaPierre's first statement was made after two police officers discussed what to do about Scott McAfee, the informant in the case and an acquaintance of LaPierre's. Officer Alan Silva testified that "the discussion [between the officers] was 'Gee, wonder if we should take McAfee in. I wonder if McAfee had anything to do with it'—something like that." Officer Silva testified that he did not intend to have his comments overheard by LaPierre, but that there was a possibility that LaPierre could hear the discussion because the officers were only 8 to 10 feet away from LaPierre. LaPierre did in fact hear the discussion, for he immediately took full responsibility for the crimes and stated that McAfee had nothing to do with them.

■ While it undoubtedly would have been sounder police practice for Officer Silva to have refrained from discussing McAfee's possible involvement within LaPierre's earshot, we cannot say that the officers should have known that their conversation was likely to evoke an incriminating response. There are undoubtedly cases in which mentioning the possible involvement of somebody else in the presence of an arrestee is likely to produce an incriminating response from the arrestee. For example, if the officers knew that McAfee and LaPierre had a close relationship,[6] the officers might have reason to

---

5. "The government filed a letter under Federal Rule of Appellate Procedure 28(j) arguing, among other things, that LaPierre waived his severance claim by failing to renew his severance motion at the close of evidence. The government did not make this argument in its answering brief however, and a letter submitted pursuant to rule 28(j) *cannot* raise a new issue. *Brady v. Gebbie,* 859 F.2d 1543, 1557 n. 13 (9th Cir.1988).

Unfortunately, this is not the only example of the government's misuse of supplemental citations and motions in this case. Indeed, in the week prior to oral argument the government filed no fewer than three documents with this court, all of which, in one way or another, supported its original 28(j) letter. Each of these documents, like the original letter, either raised new issues or reargued previously raised issues. Both of these tactics are inappropriate. Rule

28(j) letters are reserved for the "setting forth [of] citations" and must *"without argument* state the reasons for the supplemental citation." FRAP 28(j) (emphasis added). *See Clapp v. Commissioner,* 875 F.2d 1396, 1401 n. 2 (9th Cir. 1989). Moreover, notwithstanding that the court struck the government's supplemental citations, government counsel persisted in raising the same contentions at oral argument.

No attorney could fail to perceive the argumentative nature of these supplemental "citations." We hope that in the future government counsel will more fully comport with the standards of professional conduct we expect from attorneys appearing before us, particularly attorneys for the United States."

6. Whether the questioning constituted interrogation is an objective test, but the officer's subjective intent in asking the question is relevant.

believe that mentioning McAfee's involvement would encourage LaPierre to incriminate himself in the interest of protecting McAfee. This is not such a case, however, and we find no evidence from the dialogue itself or from the context in which it took place to support a holding that the district court clearly erred in finding that the officers' conversation did not constitute interrogation.

LaPierre's second challenge is to a set of statements made during a dialogue with Officer Daniel Gooch, who was sitting next to and guarding LaPierre. During this dialogue, LaPierre told Gooch that the officers had not gotten everything they were looking for and offered to split the remaining money with him. According to Officer Gooch, "I was standing guard over [LaPierre] and he started smiling toward me, and he said 'Gooch, you know they never got all the stuff.'" Gooch responded, "What?", to which LaPierre repeated, "they never got all the stuff." Gooch then asked, "What do you mean?" LaPierre said, "if you give me half, I'll give you the other half, no one has to know anything." Gooch told LaPierre, "No, the detectives, they got all the stuff." LaPierre then said, "No, check. Check under the mattress." Gooch did check under the mattress, and he found a roll of U.S. currency which was subsequently traced to one of the banks that had been robbed.

The district court did not clearly err in finding that Gooch's conversation with LaPierre did not constitute interrogation. LaPierre, not Gooch, initiated the dialogue. Moreover, Gooch's questions to LaPierre appear to be simply polite attempts to have LaPierre clarify what to Gooch must have seemed to be somewhat incoherent rambling. Finally, the statement that actually prompted LaPierre to produce the incriminating evidence was Gooch's assertion that the detectives had recovered all of the money. This appears to be a statement designed to end the dialogue, not further it. Accordingly, the district court properly denied LaPierre's motion to suppress his post-arrest statements.[7]

*Innis,* 446 U.S. at 301–02, 100 S.Ct. at 1690; *Disla,* 805 F.2d at 1347.

**7.** Furthermore, we cannot entirely overlook the fact that LaPierre may have been attempting a

## V

Finally, we consider LaPierre's challenge to his sentence. LaPierre claims that the district court erroneously refused an acceptance of responsibility reduction on the grounds that LaPierre was planning to appeal. At the time LaPierre was sentenced, Sentencing Guideline § 3E1.1(a) permitted a two-level reduction if "the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." The district court declined to grant the reduction, stating

> You can't do it when you're reserving you're [sic] position for appeal. You can't really have your cake and eat it at the same time.

> I don't see it here when the defendant maintains his silence and fails to communicate with the Probation Department.

The district court's explanation for its denial of the acceptance of responsibility reduction is ambiguous. If the district court denied the reduction on the basis that the defendant exercised his right to appeal, the district court erred. We agree with the Eleventh Circuit that "3E1.1 does not allow the judge to weigh against the defendant the defendant's exercise of constitutional or statutory rights," including the right to appeal. *United States v. Rodriguez,* 959 F.2d 193, 197 (11th Cir.1992); *see also United States v. Watt,* 910 F.2d 587, 592 (9th Cir.1990) ("a sentencing court cannot consider against a defendant any constitutionally protected conduct...."). Likewise, if the district court denied the reduction on the basis that the defendant exercised his privilege against self-incrimination by refusing to discuss his role in the offenses with the Probation Officer, the district court erred. The privilege against self-incrimination applies throughout a defendant's sentencing proceedings. *Watt,* 910 F.2d at 591. "Penalizing a defendant for failing ... to make incriminating statements violates his constitutionally protected rights." *Id.* at 593.

further crime, bribery of a police officer. *See* Haw.Rev.Stat. §§ 710–1040.

*United States v. Skillman,* 922 F.2d 1370 (9th Cir.1991), is not to the contrary. In *Skillman,* we reversed a district court's ruling that any defendant who invokes the privilege is *automatically entitled* to a two-level reduction. 922 F.2d at 1379.[8] Because the defendant had shown absolutely no evidence of contrition, he was not entitled to a reduction for acceptance of responsibility. *See id.* at 1378–79. *Skillman* did not hold that a defendant *could* not demonstrate acceptance of responsibility if he failed to discuss the offense. To the contrary, the court expressly noted that one who asserts his Fifth Amendment privilege is not precluded from establishing his acceptance of responsibility. *See id.* at 1378. We held only that in light of his total conduct, Skillman did not do so.

In this case, by contrast, LaPierre made statements immediately upon his arrest, including accepting full responsibility for the crimes, and showed the officers where the money from the robbery was hidden. He wrote the district court a letter of apology and addressed the court at allocution, both times expressing his remorse and his guilt for robbing the banks. The district court accepted the sincerity of LaPierre's statements, but apparently believed that some admission of factual, rather than moral, culpability was required. The court erred in denying a reduction on this ground if the court was otherwise convinced that LaPierre accepted the responsibility for his conduct.

■■■ If there is insufficient evidence to establish acceptance of responsibility, denial of a reduction is appropriate. This is so even if the lack of evidence results from the exercise of constitutional rights. "[T]he exercise of [ ] rights may diminish the defendant's chances of being granted the two level reduction, not because it is weighed against him but because it is likely that there is less evidence of acceptance to weigh in his favor." *United States v. Rodriguez,* 959 F.2d at 197. The district court may not, however, discount evidence of contrition because of a refusal to discuss the facts of the case with the probation officer. *Watt,* 910 F.2d at 592.

Because of this ambiguity, and because of the importance of these verbal formulations, we remand for clarification of the basis for the district court's denial of the reduction.

## VI

On the hearing on remand, the government shall have the opportunity to prove by clear and convincing evidence that the in-court identifications had an independent origin and that the testimony regarding the lineup identifications was harmless beyond a reasonable doubt. Based upon how the district court resolves these issues, it shall then determine whether Officer Miller's erroneous opinion testimony was harmless error. If the district court reinstates LaPierre's convictions, or if LaPierre is retried and convicted, the court shall reconsider its decision denying LaPierre a downward departure for acceptance of responsibility in accordance with this opinion.

VACATED AND REMANDED.

---

**8.** *United States v. Herrera–Figueroa,* 918 F.2d 1430 (9th Cir.1990), relied on an earlier version of *Skillman* that was subsequently withdrawn.

Its reading of that case is questionable at best, in light of both *Watt* and the final version of the *Skillman* opinion.