OPINION OF THE COURT
SCIRICA, Chief Judge.
Robert Earl Martin appeals from an order denying his motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Martin was convicted of armed bank robbery and firearms violations and sentenced to life imprisonment under 18 U.S.C. § 3599(c), the “three strikes” statute. Martin’s two prior convictions were for second degree murder and also for armed bank robbery and firearm possession. On direct appeal, we affirmed his judgment of conviction and sentence. United States v. Martin, 46 Fed. Appx. 119, 123 (3d Cir.2002). We have jurisdiction under 28 U.S.C. §§ 2253 and 1291, and will affirm.
I.
A grand jury returned a two-count indictment against Robert Earl Martin, charging him with armed bank robbery, in violation of 18 U.S.C. § 2113(d), and using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). The indictment charged Martin with robbing a United Bank branch at 2820 West Girard Avenue in Philadelphia, Pennsylvania, on March 6, 1998, stealing $6,694 from the bank, and using a sawed-off, double-barreled shotgun during the robbery. The entire armed robbery was captured on the bank’s videotape surveillance.
The case was tried to a jury. At trial, the jury compared eighty photographs from the bank’s surveillance cameras, the video surveillance tape of the bank robbery, and a photograph of Martin taken on the day of his arraignment. A surveillance photograph of the robber leaving the bank, which we have examined, is clear and definite. The jury observed Martin in person throughout the trial. Three bank employees testified about the robbery and positively identified Martin as the individual who robbed the bank. Two of these bank employees, Sandra Risco and Kimberly Smiley, identified Martin from a photo spread shortly after the robbery.
Sandra Risco, the bank’s head teller, testified Martin entered the bank, put what “looked like a rifle with barrels [that *394 were] very short” under the bank security guard Smiley’s chin. Martin brought the security guard to Risco’s teller window and looked at Risco, motioning to her to buzz him into the teller area. After the robbery, Risco described the robber as a black male, a few inches taller than five feet six inches, 130-140 pounds, wearing a green baseball cap, a zipped-up blue jacket, and having a “straggly,” unshaven face. She remembered the robber had a distinctive “side-to-side” walk. FBI Agent Ronald Manning had observed Martin while he was in FBI custody on March 25, 1998, and testified Martin moved with a “pigeon-toed” walk.
According to Kimberly Smiley, a woman who was a uniformed but unarmed security officer provided to the bank by a professional security service, a man entered the bank at about 12:30, March 6, 1998. He went up to the tellers’ window and looked in. Smiley asked the man his business. He said that he was looking for “a tall female with long hair or something.” Smiley told him that there was no one like that in the bank on this day. The man left. Twenty minutes later the same man returned and pointed a sawed-off shot gun at Smiley. She was approximately the same height as the man and looked directly into his eyes. She smacked the gun. The man hit her with it on the right side of her head and asked if Smiley thought that he was playing. The man grabbed Smiley’s collar, stuck the gun under her collar and pulled her through the lobby towards the back of the bank. The man kept saying this was a stick up and telling the bank tellers to open up the door to their area or he would kill Smiley. The man kept hold of Smiley until they entered the customers’ service area, where he left her. She watched as he entered the tellers’ area and as he began emptying a drawer. She then fled into the street to find a telephone to call the police. Smiley identified the defendant as the man she had spoken to, whose gun she had slapped, who had hit her on the face and who had dragged her from the foyer across the lobby to the customers’ service area. Smiley testified, “I’ll never forget his face.”
At the end of March, 1998, an F.B.I. agent showed Smiley a variety of photographs and she went directly to a photograph of the defendant, saying, “This is the guy.” Cross-examination produced nothing to shake Smiley’s reliability or recollection.
Margaret Green, the bank’s customer service representative, testified she observed Martin pointing a sawed-off shotgun at the bank’s security guard and demanding to be buzzed into the teller area. Green buzzed in Martin and watched him enter and exit the teller area. After the robbery, Green described the robber as “a black male, medium height, medium build, about ... [160 to 170] pounds, wearing dark clothing, pants and jacket, a jacket that zipped up the front.”
Philadelphia Detective Mary Seifert, the arresting officer, testified about the facts leading to Martin’s arrest. On cross-examination she explained she had received information from an informant, Edna Cook, who had identified Martin from the surveillance photograph and indicated the barbershop where Martin worked. On direct examination, Detective Seifert said she had arrested Martin, as opposed to other individuals in the barbershop where Martin was found, because she had “recognized [Martin] as being the person in [the surveillance] photograph ... taken the day of the robbery.” Defense witness Richard Vorder Bruegge, an FBI photographic evidence examiner, testified he was unable to positively identify Martin as the individual in the bank surveillance photograph, but stated he “was very close to making an identification.”
*395 All sides stipulated that the robbery lasted approximately one minute. As noted, one identification witness saw Martin twice that day and the bank’s surveillance system, active throughout the robbery, yielded eighty photographs of the robbery and the robber.
The jury found Martin guilty on both charges. After denying Martin’s post-trial motion for judgment of acquittal, United States v. Martin, No. 98-178, 2000 WL 238217 (E.D.Pa. Feb. 25, 2000), the District Court sentenced Martin on August 1, 2001, to life imprisonment under the “three strikes” statute, 18 U.S.C. § 3559(c), because Martin had two prior violent felony convictions. Martin timely appealed. We affirmed his conviction and sentence on July 30, 2002, finding “the evidence presented at trial was substantial ... [and] there was ample evidence for the jury to determine Martin’s guilt.” Martin, 46 Fed.Appx. at 123.
Martin filed a timely pro se petition under 28 U.S.C. § 2255, contending ineffective assistance of counsel for his trial counsel’s failure to: (1) suppress the arresting officer’s testimony; (2) request a Barber jury charge to caution the jury about unreliable identification testimony; and (3) call two alibi witnesses to testify. The District Court appointed counsel, and held an evidentiary hearing. Martin’s trial counsel did not testify at the evidentiary hearing. The District Court denied Martin’s § 2255 petition. United States v. Martin, No. 98-178, 2005 WL 1168383 (E.D.Pa. May 16, 2005).
The District Court found Martin had not presented sufficient evidence to show his trial counsel’s failure to suppress Detective Seifert’s testimony had not been strategic nor had Martin demonstrated prejudice in light of the other evidence before the jury. The court also found it would not necessarily have granted a request for a Barber jury charge if asked, and it did not find “a reasonable probability of a different outcome had the jury received the Barber instruction.” The court found Martin had not demonstrated that “trial counsel [had] made an objectively unreasonable strategic decision not to call the alibi witnesses.” The District Court did not grant a certificate of appealability.
We granted a certificate of appealability “as to whether trial counsel was ineffective with respect to: (1) not having objected to Seifert’s identification testimony and not having cross-examined with respect thereto; (2) not having requested jury instructions regarding identification testimony; and (3) failure to call Mr. Polk and Mr. El as witnesses.” Our review over the legal component of a claim for ineffective assistance of counsel is plenary while underlying facts are reviewed for clear error. See United States v. Smack, 347 F.3d 533, 537 (3d Cir.2003).
II.
To establish a claim of ineffective assistance of counsel, Martin must demonstrate his attorney’s performance was deficient and that he was prejudiced by this deficiency. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). That is, he must prove counsel’s performance “fell below an objective standard of reasonableness,” id. at 688, 104 S.Ct. 2052, and that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different,” id. at 694, 104 S.Ct. 2052. Counsel cannot be ineffective for failing to raise meritless claims, and counsel’s strategic choices are reviewed with a strong presumption of correctness. See Sistrunk v. Vaughn, 96 F.3d 666, 670 (3d Cir.1996).
To succeed on an ineffective assistance of counsel claim, petitioners must show counsel’s performance was deficient based on the “facts of the particular case, viewed *396 as of the time of counsel’s conduct.” Strickland, 466 U.S. at 690, 104 S.Ct. 2052. Petitioners may overcome the “presumption that counsel’s conduct falls within the wide range of reasonable professional assistance,” id. at 689, 104 S.Ct. 2052, by “showing that no sound strategy posited by the [government] could have supported the conduct,” Thomas v. Varner, 428 F.3d 491, 500 (3d Cir.2005). Under the prejudice prong, “a reasonable probability is one ‘sufficient to undermine confidence in the outcome.’ ” United States v. Gray, 878 F.2d 702, 710 (3d Cir.1989) (quoting Strickland, 466 U.S. at 694, 104 S.Ct. 2052). We must consider the totality of the evidence at trial in our prejudice evaluation: “ ‘a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.’” Id. at 711, 104 S.Ct. 2052 (quoting Strickland, 466 U.S. at 696, 104 S.Ct. 2052).
A.
Martin contends trial counsel was ineffective in not attempting to exclude Detective Seifert’s testimony as inadmissible lay opinion under Fed.R.Evid. 701[1] because she was not an eyewitness to the robbery, and also because counsel elicited prejudicial testimony on cross-examination.[2]
We believe Detective Seifert’s testimony provided admissible background evidence explaining the arrest, “helpful to a clear understanding” of her testimony.[3] As the arresting officer, Detective Seifert testified about the circumstances leading to Martin’s arrest, including why she arrested Martin, as opposed to anybody else in the barbershop. Detective Seifert stated she arrested Martin because she had “recognized him [Martin] as being the person in this photograph, which is a surveillance photo taken the day of the robbery.... ”
In support of his argument, Martin cites United States v. LaPierre, 998 F.2d 1460 (9th Cir.1993). In LaPierre, the defendant was convicted of bank robbery and weapons offenses. The Court of Appeals for the Ninth Circuit vacated and remanded the conviction for several reasons: 1) La-
*397 Pierre’s right to counsel was violated because his counsel was prohibited from participating in the early stages of the post-charge lineup; 2) the in-court testimony, and possibly the in-court identifications, of three prosecution witnesses were tainted by the illegal lineup; 3) the district court’s refusal of an acceptance of responsibility reduction to his sentence was vague and perhaps improperly influenced by the fact the defendant appealed; and 4) a police officer investigating the robberies gave lay opinion testimony as to whether the individual pictured in surveillance photos was LaPierre. Id. at 1463-65,1467-68.
In LaPierre, the police officer who investigated the bank robberies gave lay opinion testimony at trial that made an identification of the defendant as the bank robber from the surveillance photographs. The Ninth Circuit found the testimony “ran the risk of invading the province of the jury and unfairly prejudicing LaPierre” and remanded for a harmless error analysis. Id. at 1465. Here, the context was different. Detective Seifert testified why she arrested Martin and not someone else in the barbershop. Her statement was “helpful to a clear understanding” of Martin’s arrest.
There is no iron-clad rule against identification testimony from an arresting officer. See United States v. Jackson, 688 F.2d 1121, 1125-26 (7th Cir.1982) (permitting a non-eyewitness to testify that the defendant was pictured in a surveillance photograph). Police officers may testify about the underlying circumstances of the arrest subject to proper evidentiary standards. Background evidence is “universally offered and admitted as an aid to understanding,” Fed.R.Evid. 401 advisory committee’s note, to “complete! ] the story of the charged offense,” United States v. Hardy, 228 F.3d 745, 748-49 (6th Cir. 2000). Police officers often make arrests based on photographs, videotapes or even drawings of suspects. As Martin conceded at the evidentiary hearing, the Government is “allowed to bring out the circumstances of the arrest,” as long as it is not “otherwise inadmissible and prejudicial opinion evidence.” Because Seifert’s testimony was an iteration of the circumstances of the arrest, it is not impermissible opinion evidence. Police officers may “complete!] the story of the charged offense,” absent prejudice or inadmissibility. Id.
As noted, trial counsel’s strategic choices are reviewed with a strong presumption of correctness. Because of the distoi’ting effects of hindsight, “a court must indulge a strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.” Strickland, 466 U.S. at 689, 104 S.Ct. 2052 (internal quotation omitted). In Thomas v. Varner, 428 F.3d 491 (3d Cir.2005), we set forth a “tiered structure with respect to Strickland’s strategic presumptions.” Id. at 499. We stated:
At first, the presumption is that counsel’s conduct might have been part of a sound strategy.... In cases hi which the record does not explicitly disclose trial counsel’s actual strategy or lack thereof (either due to lack of diligence on the part of the petitioner or due to the unavailability of counsel), the presumption may only be rebutted through a showing that no sound strategy ... could have supported the conduct.
Id. at 499-500 (internal citations omitted). And “it is critical that courts be ‘highly deferential’ to counsel’s reasonable strategic decisions and guard against the temptation to engage in hindsight.” Marshall v. Hendricks, 307 F.3d 36, 85 (3d Cir.2002) *398 (quoting Strickland, 466 U.S. at 689-90, 104 S.Ct. 2052). The Government may engage in record-based speculation in determining trial counsel’s strategy. Buehl v. Vaughn, 166 F.3d 163, 176 (3d Cir.1999).
The Government posits that defense trial counsel’s strategy was to weaken Seifert’s identification of Martin, that is, to show that Seifert could not have identified Martin in the barbershop without Edna Cook’s help. Martin contends trial counsel was ineffective in cross-examining Detective Seifert, particularly in asking how she was able to identify Martin:
Q [Trial Counsel]: Okay. And you had received information that day, as you indicated by indicating you had the name Rob from a woman named Edna Cook, is that correct?
A [Detective Seifert]: That is correct, sir.
Q: Okay. And Edna Cook had seen that photograph that you have or a copy of that photograph that you have, and had indicated to you that she thought that was Rob, is that fair to say?
A: That’s correct.
Q: And so armed with that information, you went to a location where Edna Cook said that this person Rob was, my client, and went in there and you found him inside, and today you’re indicating that you think that the individual pictured in that photograph is my client, Rob Martin, is that fair to say?
A: It is him.
Q: Well, it is him? How do you—did you—do you have fingerprints—
A: Well, it looks like him.
Q: —from the bank?
A: It looks like him.
Q: It looks like him. Thank you.
Based on this exchange, we cannot say the strategy posited by the Government is outside the bounds of reasonableness under prevailing professional norms. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052.
At the evidentiary hearing on his § 2255 petition, Martin had his trial counsel under subpoena but chose not to call him. Martin’s failure to question trial counsel about his strategy demonstrates the weakness of Martin’s argument. Martin contends there was no reasonable basis for trial counsel’s actions.[4] But basing an ineffective assistance claim solely on the trial record strengthens the strategic presumption because a court “ ‘may have no way of knowing whether a seemingly unusual or misguided action by counsel had a strategic motive.’ ” Yarborough v. Gentry, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (quoting Massaro v. United States, 538 U.S. 500, 505, 123 S.Ct. 1690, 155 L.Ed.2d 714 (2003)). As noted, the government contends trial counsel used Detective Seifert’s testimony to undermine the reliability of the surveillance photographs. Martin had the opportunity to examine defense trial counsel to try to rebut a presumption of correctness but chose not to.
Martin has not put forth sufficient evidence to demonstrate trial counsel’s performance was objectively unreasonable or to rebut a purported trial strategy. But even if Martin’s trial counsel’s performance were deficient, Martin did not demonstrate prejudice. The jury viewed the video surveillance tape of the bank robbery, surveillance photographs, Martin’s arrest photograph, and heard testimony from three eyewitnesses, all of which they could compare. This evidence was considerably more substantial and significant than Detective Seifert’s testimony. See United *399 States v. Jackson, 688 F.2d 1121, 1126 (7th Cir.1982) (“The jury was presented with other evidence, such as the testimony of [a witness] and the photographs of the robbery,” such that reversal was not required where non-eyewitness testimony had been improperly admitted under Rule 701). The District Court found because of the “substantial amount of evidence ... apart from Detective Seifert’s testimony ... [t]here is not a reasonable probability that the jury would have found Martin not guilty had Detective Seifert’s testimony been excluded or not elicited.” We agree with this assessment. In particular, the jury had the testimony of Smiley, the bank security guard, who first encountered a visitor to the bank under entirely peaceful circumstances. Smiley’s identification of the visitor as the robber who returned twenty minutes later, and as the defendant, was in itself a basis for the jury’s verdict. In light of this other evidence, we see no prejudice.
We agree with our dissenting colleague that eyewitness identification can be problematic; cross-racial eyewitness identification even more so, but that is not at issue here. As noted, the crucial evidence in this case consisted of the eyewitness identification of Martin by three bank employees, the videotape, and the photographs taken by the bank’s surveillance camera. Moreover, the jury observed Martin throughout the trial.
Our dissenting colleague cites “the poor quality of the bank surveillance photographs.” But the surveillance photograph of the robber leaving the bank is clear and definite. Our dissenting colleague cites the jury’s “expression of doubt” and its “apparent hesitancy” to convict. We respectfully suggest that these observations are speculative.
The Court of Appeals addressed the sufficiency of the evidence on direct appeal and found “there was ample evidence for the jury to determine Martin’s guilt.” Martin, 46 Fed.Appx. at 123. On the § 2255 petition, the District Court found “there was a substantial amount of evidence the jury could have relied on apart from Detective Seifert’s statements.” We agree.
B.
Martin’s trial counsel was not ineffective for failing to request a cautionary Barber jury instruction. In United States v. Barber, 442 F.2d 517 (3d Cir.1971), we required courts to admonish juries “that the witness’ testimony as to identity must be received with caution and scrutinized with care” when identification testimony fails to meet any factor in the following four-factor test: “(1) if the witness had the opportunity to observe the accused; (2) if the witness is positive in his identification; (3) if the witness’ identification testimony is not weakened by prior failure to identify or by prior inconsistent identification; and (4) if, after cross-examination, his testimony remains positive and unqualified.” Id. at 529. The facts in Barber had prompted our imposition of a cautionary instruction. In Barber, a group of fifteen men assaulted two FBI agents in an attack that lasted only a few minutes, and eyewitnesses gave uncertain and vacillating testimony. Id. at 519, 524-25.[5]
Martin contends some of the bank employees’ eyewitness testimony failed to meet the first two Barber factors and ac *400 cordingly, Ms trial counsel was deficient in not requesting the Barber jury mstruction. At trial, defense counsel probed the employees’ “obstructed” views of the robber and the short period of time, and some minor discrepancies about height, weight, and specific descriptions of the robber’s hat. The District Court did not find a strategic justification for counsel’s failure to request a Barber instruction, but rather stated that it might not have given the instruction if asked. Based on the strong evidence, the District Court held, “Martin has not shown there would be a reasonable probability of a different outcome had the jury received the Barber instruction.” We agree and find Martin has not sufficiently demonstrated that “but for counsel’s unprofessional errors, the result of the proceeding would have been different” because of the overwhelming evidence consisting of the surveillance photographs, the arrest photographs, and the identification testimony of the bank employees, includMg one who had viewed Martin twice within a twenty minute period.[6] Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
C.
Martin’s trial counsel was not ineffective for failing to call two witnesses to testify at trial. Trial counsel has a duty to investigate potential witnesses. See United States v. Kauffman, 109 F.3d 186, 190 (3d Cir.1997). But here, counsel satisfied that duty. Witnesses Mark El and Tyrone Polk, respectively owner and employee of the barbershop where Mai’tin worked, were present at Martin’s trial and prepared to testify. But trial counsel’s decision not to call these witnesses was within the range of competent representation. See Strickland, 466 U.S. at 690, 104 S.Ct. 2052.
As noted, at the evidentiary hearing before the District Court on § 2255 habeas review, Martin did not call his trial counsel to present testimony, nor did he offer any other evidence to rebut the strategic presumption. Accordingly, Martin may only rebut the presumption by showing no sound strategy existed. He has not done so here.
Martin contends El and Polk should have been called to testify as alibi witnesses. The government contends it was sound strategy not to call these witnesses because of the witnesses’ inability to provide an alibi for Martin. See Thomas v. Varner, 428 F.3d 491, 500 n. 8 (3d Cir.2005) (“[I]n opposing a petitioner’s attempt to disprove the existence of a possible sound strategy, it is entirely proper for the [government] to engage in record-based speculation as to what counsel’s strategy might have been.”). Both the FBI and the Defender Association of Philadelphia investigative reports of El and Polk demonstrate neither witness could account for Martin’s whereabouts around the time of the robbery. Polk noted he could not “pinpoint exactly” Martin’s location on the day in question and El told the FBI that Martin would come and go from the barbershop throughout the day. Neither witness provided a suitable alibi for Martin, and Martin did not call either potential witness to testify at the § 2255 habeas evidentiary hearing. Accordingly, trial counsel’s performance was not deficient with respect to his decision not to call these witnesses to testify as alibi wit *401 nesses, nor do we find the outcome undermined by his decision.
In addition to alibi testimony, Martin contends El and Polk would have testified as to Martin’s health limitations, which could have raised doubts as to Martin’s physical ability to commit the robbery. But Martin has provided no evidence to rebut the Strickland presumption that trial “counsel’s conduct might have been part of a sound strategy.” Thomas, 428 F.3d at 499. Even without the Strickland presumption, we find Martin was obliged to present evidence on the health issue, and he has failed to do so.
Although we need not speculate as to trial counsel’s probable strategy, it was not objectively unreasonable for defense counsel not to call Polk to testify because Polk had been convicted of multiple felonies, which were admissible for impeachment purposes. Additionally, the investigative reports contain only minimal information regarding El’s probable testimony about Martin’s health problems as they relate to his ability to commit the robbery. El told the FBI investigator that Martin had been hospitalized with heart problems for a week and he told the defense investigator that Martin “has a very bad heart and has had prior surgery for this affliction.” There was no indication when Martin had these health problems. Furthermore, El told the FBI investigator, “Martin has a drug problem,” which could have been admissible as evidence of motive. Because Martin did not present any evidence at the evidentiary hearing to rebut the presumption of an objectively reasonable trial strategy, we agree with the District Court that Martin has not met his burden on this claim.
III.
For the foregoing reasons, we will affirm the District Court’s judgment, denying Martin’s § 2255 petition.

. Fed.R.Evid. 701 provides:
If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness’ testimony or the determination of a fact in issue, and (d) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

. The Advisory Committee Notes for Rule 701 suggest cross-examination may be a helpful tool for pointing out weakness in testimony because "necessity as a standard for permitting opinions and conclusions has proved too elusive and too unadaptable to particular situations for purposes of satisfactory judicial administration.” Fed.R.Evid. 702 advisory committee’s note.

. The following is part of Government counsel's direct examination of Detective Seifert:
Q [Government]: Did you go into the barbershop when you went there that day?
A [Detective Seifert]: Yes, I did.
Q: And did you have—were you by yourself or with other persons?
A: I was with other persons.
Q: When you went into the barbershop, was there more than one person inside or only one person?
A: There was more than one.
Q: And you arrested the defendant?
A: Yes, I did.
Q: Again, what did you arrest him for, as opposed to somebody else in the barbershop? A: I recognized him as being the person in this photograph, which is a surveillance photo taken the day of the robbery of the bank robber.
Q: Now, at the time that you arrested Mr. Martin, did you know his full name?
A: No, I did not.
Q: Did you have any name for him?
A: We had received the name of Rob, only Rob, R-O-B.

. The District Court considered the strategy raised by the Government and found "[i]t could have been a strategic decision on the part of trial counsel, and Martin does not present sufficient evidence to meet his burden of proving otherwise.”

. In Barber, we had agreed with appellants’ contention that “the entangled circumstances of th[e] case compelled a more exacting charge to underscore the critical nature of the identification issue—that the commingling of participants and passersby in the vortex of a sudden mob scene rendered arduous and crucial the task of determining who did what to whom.” Id. at 525.

. Additionally, we note that the trial court, employing the discretion we endorsed in Barber, sufficiently put the jury on notice to use caution when evaluating the identification testimony: “We recognize that the trial courts are invested with wide discretionary power in the selection of appropriate language in jury instructions ... [and] we endorse the wide latitude to be accorded the trial courts in the area of jury instructions, [while respecting the provided] guidelines....”