

Villanova University School of Law Digital Repository

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

1-30-2008

# USA v. Martin

Precedential or Non-Precedential: Non-Precedential

Docket No. 05-2937

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"USA v. Martin" (2008). *2008 Decisions*. Paper 1679.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1679

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-2937

———————

UNITED STATES OF AMERICA

v.

ROBERT EARL MARTIN,
                              Appellant

———————

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
D.C. Criminal No. 98-cr-0178
(Honorable Norma L. Shapiro)

———————

Argued March 1, 2007
Before:  SCIRICA, *Chief Judge*, McKEE and NOONAN[*], *Circuit Judges*.

(Filed: January 30, 2008)

PAUL M. MESSING, ESQUIRE (ARGUED)
Kairys, Rudovsky, Epstein & Messing
718 Arch Street, Suite 501 South
Philadelphia, Pennsylvania 19107
        Attorney for Appellant

MARY E. CRAWLEY, ESQUIRE (ARGUED)
Office of United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, Pennsylvania 19106
        Attorney for Appellee

———————

[*]The Honorable John T. Noonan, Jr., United States Circuit Judge for the Ninth Judicial
Circuit, sitting by designation.

OPINION OF THE COURT

SCIRICA, *Chief Judge*.

Robert Earl Martin appeals from an order denying his motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. Martin was convicted of armed bank robbery and firearms violations and sentenced to life imprisonment under 18 U.S.C. § 3599(c), the "three strikes" statute. Martin's two prior convictions were for second degree murder and also for armed bank robbery and firearm possession. On direct appeal, we affirmed his judgment of conviction and sentence. *United States v. Martin*, 46 Fed. App'x 119, 123 (3d Cir. 2002). We have jurisdiction under 28 U.S.C. §§ 2253 and 1291, and will affirm.

## I.

A grand jury returned a two-count indictment against Robert Earl Martin, charging him with armed bank robbery, in violation of 18 U.S.C. § 2113(d), and using and carrying a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c). The indictment charged Martin with robbing a United Bank branch at 2820 West Girard Avenue in Philadelphia, Pennsylvania, on March 6, 1998, stealing $6,694 from the bank, and using a sawed-off, double-barreled shotgun during the robbery. The entire armed robbery was captured on the bank's videotape surveillance.

The case was tried to a jury. At trial, the jury compared eighty photographs from the bank's surveillance cameras, the video surveillance tape of the bank robbery, and a photograph of Martin taken on the day of his arraignment. A surveillance photograph of the robber leaving the bank, which we have examined, is clear and definite. The jury observed Martin in person throughout the trial. Three bank employees testified about the robbery and positively identified Martin as the individual who robbed the bank. Two of these bank employees, Sandra Risco and Kimberly Smiley, identified Martin from a photo spread shortly after the robbery.

Sandra Risco, the bank's head teller, testified Martin entered the bank, put what "looked like a rifle with barrels [that were] very short" under the bank security guard Smiley's chin. Martin brought the security guard to Risco's teller window and looked at Risco, motioning to her to buzz him into the teller area. After the robbery, Risco described the robber as a black male, a few inches taller than five feet six inches, 130–140 pounds, wearing a green baseball cap, a zipped-up blue jacket, and having a "straggly," unshaven face. She remembered the robber had a distinctive "side-to-side" walk. FBI Agent Ronald Manning had observed Martin while he was in FBI custody on March 25, 1998, and testified Martin moved with a "pigeon-toed" walk.

According to Kimberley Smiley, a woman who was a uniformed but unarmed security officer provided to the bank by a professional security service, a man entered the bank at about 12:30, March 6, 1998. He went up to the tellers' window and looked in.

3

Smiley asked the man his business.  He said that he was looking for "a tall female with long hair or something."  Smiley told him that there was no one like that in the bank on this day.  The man left.  Twenty minutes later the same man returned and pointed a sawed-off shot gun at Smiley.  She was approximately the same height as the man and looked directly into his eyes.  She smacked the gun.  The man hit her with it on the right side of her head and asked if Smiley thought that he was playing.  The man grabbed Smiley's collar, stuck the gun under her collar and pulled her through the lobby towards the back of the bank.  The man kept saying this was a stick up and telling the bank tellers to open up the door to their area or he would kill Smiley.  The man kept hold of Smiley until they entered the customers' service area, where he left her.  She watched as he entered the tellers' area and as he began emptying a drawer.  She then fled into the street to find a telephone to call the police.  Smiley identified the defendant as the man she had spoken to, whose gun she had slapped, who had hit her on the face and who had dragged her from the foyer across the lobby to the customers' service area.  Smiley testified, "I'll never forget his face.

At the end of March, 1998, an F.B.I. agent showed Smiley a variety of photographs and she went directly to a photograph of the defendant, saying, "This is the guy."  Cross-examination produced nothing to shake Smiley's reliability or recollection.

Margaret Green, the bank's customer service representative, testified she observed Martin pointing a sawed-off shotgun at the bank's security guard and demanding to be

4

buzzed into the teller area. Green buzzed in Martin and watched him enter and exit the teller area. After the robbery, Green described the robber as "a black male, medium height, medium build, about . . . [160 to 170] pounds, wearing dark clothing, pants and jacket, a jacket that zipped up the front."

Philadelphia Detective Mary Seifert, the arresting officer, testified about the facts leading to Martin's arrest. On cross-examination she explained she had received information from an informant, Edna Cook, who had identified Martin from the surveillance photograph and indicated the barbershop where Martin worked. On direct examination, Detective Seifert said she had arrested Martin, as opposed to other individuals in the barbershop where Martin was found, because she had "recognized [Martin] as being the person in [the surveillance] photograph . . . taken the day of the robbery." Defense witness Richard Vorder Bruegge, an FBI photographic evidence examiner, testified he was unable to positively identify Martin as the individual in the bank surveillance photograph, but stated he "was very close to making an identification."

All sides stipulated that the robbery lasted approximately one minute. As noted, one identification witness saw Martin twice that day and the bank's surveillance system, active throughout the robbery, yielded eighty photographs of the robbery and the robber.

The jury found Martin guilty on both charges. After denying Martin's post-trial motion for judgment of acquittal, *United States v. Martin*, No. 98-178, 2000 WL 233217 (E.D. Pa. Feb. 25, 2000), the District Court sentenced Martin on August 1, 2001, to life

5

imprisonment under the "three strikes" statute, 18 U.S.C. § 3559(c), because Martin had two prior violent felony convictions. Martin timely appealed. We affirmed his conviction and sentence on July 30, 2002, finding "the evidence presented at trial was substantial . . . [and] there was ample evidence for the jury to determine Martin's guilt." *Martin*, 46 Fed. App'x at 123.

Martin filed a timely pro se petition under 28 U.S.C. § 2255, contending ineffective assistance of counsel for his trial counsel's failure to: (1) suppress the arresting officer's testimony; (2) request a *Barber* jury charge to caution the jury about unreliable identification testimony; and (3) call two alibi witnesses to testify. The District Court appointed counsel, and held an evidentiary hearing. Martin's trial counsel did not testify at the evidentiary hearing. The District Court denied Martin's § 2255 petition. *United States v. Martin*, No. 98-178, 2005 WL 1168383 (E.D. Pa. May 16, 2005).

The District Court found Martin had not presented sufficient evidence to show his trial counsel's failure to suppress Detective Seifert's testimony had not been strategic nor had Martin demonstrated prejudice in light of the other evidence before the jury. The court also found it would not necessarily have granted a request for a *Barber* jury charge if asked, and it did not find "a reasonable probability of a different outcome had the jury received the *Barber* instruction." The court found Martin had not demonstrated that "trial counsel [had] made an objectively unreasonable strategic decision not to call the alibi witnesses." The District Court did not grant a certificate of appealability.

We granted a certificate of appealability "as to whether trial counsel was ineffective with respect to: (1) not having objected to Seifert's identification testimony and not having cross-examined with respect thereto; (2) not having requested jury instructions regarding identification testimony; and (3) failure to call Mr. Polk and Mr. El as witnesses." Our review over the legal component of a claim for ineffective assistance of counsel is plenary while underlying facts are reviewed for clear error. *See United States v. Smack*, 347 F.3d 533, 537 (3d. Cir. 2003).

## II.

To establish a claim of ineffective assistance of counsel, Martin must demonstrate his attorney's performance was deficient and that he was prejudiced by this deficiency. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). That is, he must prove counsel's performance "fell below an objective standard of reasonableness," *id.* at 688, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694. Counsel cannot be ineffective for failing to raise meritless claims, and counsel's strategic choices are reviewed with a strong presumption of correctness. *See Sistrunk v. Vaughn*, 96 F.3d 666, 670 (3d Cir. 1996).

To succeed on an ineffective assistance of counsel claim, petitioners must show counsel's performance was deficient based on the "facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Petitioners may overcome

7

the "presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689, by "showing that no sound strategy posited by the [government] could have supported the conduct," *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005). Under the prejudice prong, "a reasonable probability is one 'sufficient to undermine confidence in the outcome.'" *United States v. Gray*, 878 F.2d 702, 710 (3d Cir. 1989) (quoting *Strickland*, 466 U.S. at 694). We must consider the totality of the evidence at trial in our prejudice evaluation: "'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" *Id.* at 711 (quoting *Strickland*, 466 U.S. at 696).

## A.

Martin contends trial counsel was ineffective in not attempting to exclude Detective Seifert's testimony as inadmissible lay opinion under Fed. R. Evid. 701[1] because she was not an eyewitness to the robbery, and also because counsel elicited prejudicial testimony on cross-examination.[2]

---

[1]Fed. R. Evid. 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (d) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

[2]The Advisory Committee Notes for Rule 701 suggest cross-examination may be a helpful tool for pointing out weakness in testimony because "necessity as a standard for permitting opinions and conclusions has proved too elusive and too unadaptable to

8

We believe Detective Seifert's testimony provided admissible background evidence explaining the arrest, "helpful to a clear understanding" of her testimony.[3] As the arresting officer, Detective Seifert testified about the circumstances leading to Martin's arrest, including why she arrested Martin, as opposed to anybody else in the barbershop. Detective Seifert stated she arrested Martin because she had "recognized him [Martin] as being the person in this photograph, which is a surveillance photo taken the day of the robbery . . . ."

In support of his argument, Martin cites *United States v. LaPierre*, 998 F.2d 1460 (9th Cir. 1993). In *LaPierre*, the defendant was convicted of bank robbery and weapons

particular situations for purposes of satisfactory judicial administration." Fed. R. Evid. 702 advisory committee's note.

[3]The following is part of Government counsel's direct examination of Detective Seifert:

Q [Government]: Did you go into the barbershop when you went there that day?
A [Detective Seifert]: Yes, I did.
Q: And did you have – were you by yourself or with other persons?
A: I was with other persons.
Q: When you went into the barbershop, was there more than one person inside or only one person?
A: There was more than one.
Q: And you arrested the defendant?
A: Yes, I did.
Q: Again, what did you arrest him for, as opposed to somebody else in the barbershop?
A: I recognized him as being the person in this photograph, which is a surveillance photo taken the day of the robbery of the bank robber.
Q: Now, at the time that you arrested Mr. Martin, did you know his full name?
A: No, I did not.
Q: Did you have any name for him?
A: We had received the name of Rob, only Rob, R-O-B.

offenses. The Court of Appeals for the Ninth Circuit vacated and remanded the conviction for several reasons: 1) LaPierre's right to counsel was violated because his counsel was prohibited from participating in the early stages of the post-charge lineup; 2) the in-court testimony, and possibly the in-court identifications, of three prosecution witnesses were tainted by the illegal lineup; 3) the district court's refusal of an acceptance of responsibility reduction to his sentence was vague and perhaps improperly influenced by the fact the defendant appealed; and 4) a police officer investigating the robberies gave lay opinion testimony as to whether the individual pictured in surveillance photos was LaPierre. *Id*. at 1463-65, 1467-68.

In *LaPierre*, the police officer who investigated the bank robberies gave lay opinion testimony at trial that made an identification of the defendant as the bank robber from the surveillance photographs. The Ninth Circuit found the testimony "ran the risk of invading the province of the jury and unfairly prejudicing LaPierre" and remanded for a harmless error analysis. *Id*. at 1465. Here, the context was different. Detective Seifert testified why she arrested Martin and not someone else in the barbershop. Her statement was "helpful to a clear understanding" of Martin's arrest.

There is no iron-clad rule against identification testimony from an arresting officer. *See United States v. Jackson*, 688 F.2d 1121, 1125-26 (7th Cir. 1982) (permitting a non-eyewitness to testify that the defendant was pictured in a surveillance photograph). Police officers may testify about the underlying circumstances of the arrest subject to proper

10

evidentiary standards. Background evidence is "universally offered and admitted as an aid to understanding," Fed. R. Evid. 401 advisory committee's note, to "complete[] the story of the charged offense," *United States v. Hardy*, 228 F.3d 745, 748-49 (6th Cir. 2000). Police officers often make arrests based on photographs, videotapes or even drawings of suspects. As Martin conceded at the evidentiary hearing, the Government is "allowed to bring out the circumstances of the arrest," as long as it is not "otherwise inadmissible and prejudicial opinion evidence." Because Seifert's testimony was an iteration of the circumstances of the arrest, it is not impermissible opinion evidence. Police officers may "complete[] the story of the charged offense," absent prejudice or inadmissibility. *Id*.

As noted, trial counsel's strategic choices are reviewed with a strong presumption of correctness. Because of the distorting effects of hindsight, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation omitted). In *Thomas v. Varner*, 428 F.3d 491 (3d Cir. 2005), we set forth a "tiered structure with respect to *Strickland*'s strategic presumptions." *Id.* at 499. We stated:

> At first, the presumption is that counsel's conduct might have been part of a sound strategy . . . . In cases in which the record does not explicitly disclose trial counsel's actual strategy or lack thereof (either due to lack of diligence on the part of the petitioner or due to the unavailability of counsel), the

11

presumption may only be rebutted through a showing that no sound strategy
. . . could have supported the conduct.

*Id.* at 499-500 (internal citations omitted). And "it is critical that courts be 'highly

deferential' to counsel's reasonable strategic decisions and guard against the temptation

to engage in hindsight." *Marshall v. Hendricks*, 307 F.3d 36, 85 (3d Cir. 2002) (quoting

*Strickland*, 466 U.S. at 689-90). The Government may engage in record-based

speculation in determining trial counsel's strategy. *Buehl v. Vaughn*, 166 F.3d 163, 176

(3d Cir. 1999).

The Government posits that defense trial counsel's strategy was to weaken

Seifert's identification of Martin, that is, to show that Seifert could not have identified

Martin in the barbershop without Edna Cook's help. Martin contends trial counsel was

ineffective in cross-examining Detective Seifert, particularly in asking how she was able

to identify Martin:

> Q [Trial Counsel]: Okay. And you had received information that day, as you
> indicated by indicating you had the name Rob from a woman named Edna Cook, is
> that correct?
> A [Detective Seifert]: That is correct, sir.
> Q: Okay. And Edna Cook had seen that photograph that you have or a copy of that
> photograph that you have, and had indicated to you that she thought that was Rob,
> is that fair to say?
> A: That's correct.
> Q: And so armed with that information, you went to a location where Edna Cook
> said that this person Rob was, my client, and went in there and you found him
> inside, and today you're indicating that you think that the individual pictured in
> that photograph is my client, Rob Martin, is that fair to say?
> A: It is him.
> Q: Well, it is him? How do you – did you – do you have fingerprints –
> A: Well, it looks like him.

12

Q: – from the bank?
A: It looks like him.
Q: It looks like him.  Thank you.

Based on this exchange, we cannot say the strategy posited by the Government is outside the bounds of reasonableness under prevailing professional norms.  *See Strickland*, 466 U.S. at 689.

At the evidentiary hearing on his § 2255 petition, Martin had his trial counsel under subpoena but chose not to call him.  Martin's failure to question trial counsel about his strategy demonstrates the weakness of Martin's argument.  Martin contends there was no reasonable basis for trial counsel's actions.[4]  But basing an ineffective assistance claim solely on the trial record strengthens the strategic presumption because a court "'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a strategic motive.'"  *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (quoting *Massaro v. United States*, 538 U.S. 500, 505 (2003).  As noted, the government contends trial counsel used Detective Seifert's testimony to undermine the reliability of the surveillance photographs.  Martin had the opportunity to examine defense trial counsel to try to rebut a presumption of correctness but chose not to.

Martin has not put forth sufficient evidence to demonstrate trial counsel's performance was objectively unreasonable or to rebut a purported trial strategy.  But even

---

[4]The District Court considered the strategy raised by the Government and found "[i]t could have been a strategic decision on the part of trial counsel, and Martin does not present sufficient evidence to meet his burden of proving otherwise."

13

if Martin's trial counsel's performance were deficient, Martin did not demonstrate prejudice. The jury viewed the video surveillance tape of the bank robbery, surveillance photographs, Martin's arrest photograph, and heard testimony from three eyewitnesses, all of which they could compare. This evidence was considerably more substantial and significant than Detective Seifert's testimony. *See United States v. Jackson*, 688 F.2d 1121, 1126 (7th Cir. 1982) ("The jury was presented with other evidence, such as the testimony of [a witness] and the photographs of the robbery," such that reversal was not required where non-eyewitness testimony had been improperly admitted under Rule 701). The District Court found because of the "substantial amount of evidence . . . apart from Detective Seifert's testimony . . . [t]here is not a reasonable probability that the jury would have found Martin not guilty had Detective Seifert's testimony been excluded or not elicited." We agree with this assessment. In particular, the jury had the testimony of Smiley, the bank security guard, who first encountered a visitor to the bank under entirely peaceful circumstances. Smiley's identification of the visitor as the robber who returned twenty minutes later, and as the defendant, was in itself a basis for the jury's verdict. In light of this other evidence, we see no prejudice.

We agree with our dissenting colleague that eyewitness identification can be problematic; cross-racial eyewitness identification even more so, but that is not at issue here. As noted, the crucial evidence in this case consisted of the eyewitness identification

14

of Martin by three bank employees, the videotape, and the photographs taken by the bank's surveillance camera. Moreover, the jury observed Martin throughout the trial.

Our dissenting colleague cites "the poor quality of the bank surveillance photographs." But the surveillance photograph of the robber leaving the bank is clear and definite. Our dissenting colleague cites the jury's "expression of doubt" and its "apparent hesitancy" to convict. We respectfully suggest that these observations are speculative.

The Court of Appeals addressed the sufficiency of the evidence on direct appeal and found "there was ample evidence for the jury to determine Martin's guilt." *Martin*, 46 Fed. App'x at 123. On the § 2255 petition, the District Court found "there was a substantial amount of evidence the jury could have relied on apart from Detective Seifert's statements." We agree.

## B.

Martin's trial counsel was not ineffective for failing to request a cautionary *Barber* jury instruction. In *United States v. Barber*, 442 F.2d 517 (3d Cir. 1971), we required courts to admonish juries "that the witness' testimony as to identity must be received with caution and scrutinized with care" when identification testimony fails to meet any factor in the following four-factor test: "(1) if the witness had the opportunity to observe the accused; (2) if the witness is positive in his identification; (3) if the witness' identification testimony is not weakened by prior failure to identify or by prior inconsistent identification; and (4) if, after cross-examination, his testimony remains positive and

15

unqualified." *Id.* at 529. The facts in *Barber* had prompted our imposition of a cautionary instruction. In *Barber*, a group of fifteen men assaulted two FBI agents in an attack that lasted only a few minutes, and eyewitnesses gave uncertain and vacillating testimony. *Id.* at 519, 524-25.[5]

Martin contends some of the bank employees' eyewitness testimony failed to meet the first two *Barber* factors and accordingly, his trial counsel was deficient in not requesting the *Barber* jury instruction. At trial, defense counsel probed the employees' "obstructed" views of the robber and the short period of time, and some minor discrepancies about height, weight, and specific descriptions of the robber's hat. The District Court did not find a strategic justification for counsel's failure to request a *Barber* instruction, but rather stated that it might not have given the instruction if asked. Based on the strong evidence, the District Court held, "Martin has not shown there would be a reasonable probability of a different outcome had the jury received the *Barber* instruction." We agree and find Martin has not sufficiently demonstrated that "but for counsel's unprofessional errors, the result of the proceeding would have been different" because of the overwhelming evidence consisting of the surveillance photographs, the arrest photographs, and the identification testimony of the bank employees, including one

_____

[5]In *Barber,* we had agreed with appellants' contention that "the entangled circumstances of th[e] case compelled a more exacting charge to underscore the critical nature of the identification issue—that the commingling of participants and passersby in the vortex of a sudden mob scene rendered arduous and crucial the task of determining who did what to whom." *Id.* at 525.

16

who had viewed Martin twice within a twenty minute period.[6] *Strickland*, 466 U.S. at 694.

C.

Martin's trial counsel was not ineffective for failing to call two witnesses to testify at trial. Trial counsel has a duty to investigate potential witnesses. *See United States v. Kauffman*, 109 F.3d 186, 190 (3d Cir. 1997). But here, counsel satisfied that duty. Witnesses Mark El and Tyrone Polk, respectively owner and employee of the barbershop where Martin worked, were present at Martin's trial and prepared to testify. But trial counsel's decision not to call these witnesses was within the range of competent representation. *See Strickland*, 566 U.S. at 690.

As noted, at the evidentiary hearing before the District Court on § 2255 habeas review, Martin did not call his trial counsel to present testimony, nor did he offer any other evidence to rebut the strategic presumption. Accordingly, Martin may only rebut the presumption by showing no sound strategy existed. He has not done so here.

Martin contends El and Polk should have been called to testify as alibi witnesses. The government contends it was sound strategy not to call these witnesses because of the

---

[6]Additionally, we note that the trial court, employing the discretion we endorsed in *Barber*, sufficiently put the jury on notice to use caution when evaluating the identification testimony: "We recognize that the trial courts are invested with wide discretionary power in the selection of appropriate language in jury instructions . . . [and] we endorse the wide latitude to be accorded the trial courts in the area of jury instructions, [while respecting the provided] guidelines . . . ."

witnesses' inability to provide an alibi for Martin. *See Thomas v. Varner*, 428 F.3d 491, 500 n.8 (3d Cir. 2005) ("[I]n opposing a petitioner's attempt to disprove the existence of a possible sound strategy, it is entirely proper for the [government] to engage in record-based speculation as to what counsel's strategy might have been."). Both the FBI and the Defender Association of Philadelphia investigative reports of El and Polk demonstrate neither witness could account for Martin's whereabouts around the time of the robbery. Polk noted he could not "pinpoint exactly" Martin's location on the day in question and El told the FBI that Martin would come and go from the barbershop throughout the day. Neither witness provided a suitable alibi for Martin, and Martin did not call either potential witness to testify at the § 2255 habeas evidentiary hearing. Accordingly, trial counsel's performance was not deficient with respect to his decision not to call these witnesses to testify as alibi witnesses, nor do we find the outcome undermined by his decision.

In addition to alibi testimony, Martin contends El and Polk would have testified as to Martin's health limitations, which could have raised doubts as to Martin's physical ability to commit the robbery. But Martin has provided no evidence to rebut the *Strickland* presumption that trial "counsel's conduct might have been part of a sound strategy." *Thomas*, 428 F.3d at 499. Even without the *Strickland* presumption, we find Martin was obliged to present evidence on the health issue, and he has failed to do so.

18

Although we need not speculate as to trial counsel's probable strategy, it was not objectively unreasonable for defense counsel not to call Polk to testify because Polk had been convicted of multiple felonies, which were admissible for impeachment purposes. Additionally, the investigative reports contain only minimal information regarding El's probable testimony about Martin's health problems as they relate to his ability to commit the robbery. El told the FBI investigator that Martin had been hospitalized with heart problems for a week and he told the defense investigator that Martin "has a very bad heart and has had prior surgery for this affliction." There was no indication when Martin had these health problems. Furthermore, El told the FBI investigator, "Martin has a drug problem," which could have been admissible as evidence of motive. Because Martin did not present any evidence at the evidentiary hearing to rebut the presumption of an objectively reasonable trial strategy, we agree with the District Court that Martin has not met his burden on this claim.

III.

For the foregoing reasons, we will affirm the District Court's judgment, denying Martin's § 2255 petition.

McKee, Circuit Judge, dissenting in part.

I agree that Martin has not established that trial counsel was ineffective for not requesting a charge pursuant to *United States v. Barber*, 442 F.2d 517 (3d Cir. 1971), or not calling Polk or El to testify. However, I disagree with the majority's conclusion that

19

defense counsel was not ineffective for failing to file a pretrial motion to restrict Detective Mary Seifert's testimony and for inexplicably eliciting Edna Cook's identification during his cross-examination of Seifert. Accordingly, I respectfully dissent from Part II. A. of the majority's opinion.

I.

Despite the other evidence in this case, it is exceedingly difficult to review this record without focusing on a single question: "Is Robert Martin the person depicted in the bank surveillance photograph(s)?". There is no doubt that Martin looks like the person in those photographs. However, after repeatedly comparing those photographs with Martin's arrest photo, I continue to wonder if Martin *is* the person in those photographs. It is obvious from this record that the jury was similarly troubled.

The majority characterizes the evidence of Martin's guilt as "significant," "strong," and "overwhelming." Maj. Op. at 5, 13, and 16. However, those characterizations are undermined by the apparent difficulty the jury had in concluding that Martin was the robber. Although there were three eyewitnesses identifications, and numerous bank surveillance photographs, there was no corroborating physical evidence. Moreover, the quality of the photographs and the strength of the eyewitness identifications is a far cry from the "strong," "significant," or "overwhelming" evidence of guilt that the majority claims. The majority's characterization of the evidence ignores

20

the poor quality of the bank surveillance photographs, as well as the dangers endemic to

eyewitness identifications. As Justice Brennan explained four decades ago:

> [I]identification evidence is peculiarly riddled with innumerable
> dangers and variable factors which might seriously, even crucially, derogate
> from a fair trial.  The vagaries of eyewitness identification are well-known;
> the annals of criminal law are rife with instances of mistaken identification.
> Mr. Justice Frankfurter once said: 'What is the worth of identification
> testimony even when uncontradicted?  The identification of strangers is
> proverbially untrustworthy.  The hazards of such testimony are established
> by a formidable number of instances in the records of English and
> American trials.'

*United States v. Wade*, 388 U.S. 218, 228 (1967) (quoting Felix Frankfurter, *The Case of*

*Sacco and Vanzetti* 30 (1927)).  This robbery lasted less than one minute, and the robber's

face was obscured for much of that brief interval.  Moreover, common sense suggests that

the tellers were distracted by the presence of a sawed-off shotgun.

My colleagues stress that over eighty surveillance photographs were entered into

evidence.  *See* Maj. Op. at 3.  However,  the vast majority of those photographs are utterly

useless.  Twenty-five of them either do not show the robber at all, or show him only

faintly in the distance with no discernable features except for his sweatshirt and cap.

Seven of the remaining photographs show only the security guard running from the bank.

Five of the photographs do show the front of the robber from recognizable range, but his

face is turned from the camera and/or obscured by his cap. Three clearly show him from

the front, but too far from the camera to clearly show the robber's face.   Only two of the

photographs show the robber's face with some clarity, and of those, only one is sharp and

21

clear. I assume that is the single picture my colleagues refer to as "*a* surveillance photograph of the robber leaving the bank . . ." . Maj. Op. at 3 (emphasis added). That single photograph is "clear and definite." *See* Maj. Op. at 14. It is also inconclusive.

Thus, the government's evidence against Martin consisted of his appearance at trial, a single surveillance photograph, the testimony of three bank employees, and the testimony of Detective Seifert, the arresting officer.

On cross-examination, defense counsel highlighted the discrepancies in the bank employees' descriptions of the robber. One teller described the robber as a Black male with "scraggly" facial hair, "thin"—weighing as little as 130 pounds, a little taller than 5'6", and wearing a blue, zip-front jacket and a green cap; another teller described the robber as a brown-complexioned male with a moustache and scraggly beard, weighing as much as 180 pounds, around 5'8" tall, and wearing a blue or black baseball cap; and the third bank employee described the robber as a Black male, of "medium height" and "medium build," about thirty to forty years old, and wearing a cap. Martin certainly does fit those general descriptions; so do many other medium-complexioned Black males with some facial hair who are of average build, average weight, and average height. By definition, most people are of "average" proportion.

Against this backdrop, Detective Seifert testified on direct examination as follows:

22

Q: Now, after the robbery itself, did you receive anything connected with the robbery?

A: Yes, I did.

Q: What did you receive?

A: I received a photograph, several photographs from the —from Detective Joseph Passio of our major crimes unit, who works with the FBI, and wanted a poster.

Q: Now, I'm showing you what's been marked as Government Exhibit 6, and ask you—I'll ask you whether this is similar to the photographs that you received from Detective Passio.

A: Yes, it is. . . .

Q: Now, directing your attention to approximately March 25, 1998, were you on duty that day?

A: Yes, I was.

Q: By that time, had you seen this photograph once or more than once?

A: More than once. . . .

Q: And were you familiar with that photograph by then?

A: Yes, I was.

Q: On that day, did you arrest anybody?

A: Yes, I did.

Q: Who did you arrest?

A: I arrested the defendant, Mr. Martin.

Q: Where did you arrest him?

A: Inside the barbershop at 2125 Ridge Avenue in Philadelphia.

Q: And had you gone there hoping that he would be there?

A: Yes.

Q: Why were you looking for a person matching this photograph?

A: To arrest him for bank robbery. . . .

Q: When you went into the barbershop, was there more than one person inside or only one person?

A: There was more than one.

Q: And you arrested this defendant?

23

A: Yes, I did.

Q: Again, what did you arrest him for, as opposed to somebody else in the barbershop?

A: I recognized him as being the person in this photograph, which is a surveillance photo taken the day of the robbery of the bank robber.

Supp. app. at 157-58.  On cross-examination, Martin's counsel elicited the following from

Detective Seifert:

Q: Okay.  And you received information that day, as you indicated by indicating you had the name  Rob from a woman named Edna Cook, is that correct?

A: That is correct, sir.

Q: Okay.  And Edna Cook had seen that photograph that you have or a copy of that photograph that you have, and had indicated to you that she thought that was Rob, is that fair to say?

A: That's correct.

Q: And so armed with that information, you went to a location where Edna Cook said that this person Rob was, my client, and went in there and you found him inside, and today you're indicating that you think that the individual pictured in that photograph is my client, Rob Martin, is that fair to say?

A: It is him.

Q: Well, it is him?  How do you—did you—do you have fingerprints—

A: Well, it looks like him.

Q: — from the bank?

A: It looks like him.

Q: It looks like him.  Thank you.

24

Supp. app. at 160-61. Thus, defense counsel asked questions that not only allowed

reinforced Seifert's identification of Martin, it also elicited the out-of-court identification

of Edna Cook.

In his case, Martin called Richard Vorder Bruegge, an expert in the field of

photographic identification. Bruegge testified that he received copies of the bank

surveillance photos, video footage from the bank's surveillance tape, and pictures of

Martin in order to compare Martin's face to the robber. Bruegge explained that, when

attempting to make an identification from photographs he compares scars, freckle

patterns, the details of a person's ear pattern, shape of the eyes, shape of the nose, creases

and lines on the person's face, blemishes on the face, and overall ear shape. He can reach

any one of three conclusions: he can positively identify the suspect, eliminate the suspect,

or not be able to reach any conclusion. After comparing photographs of Martin to the

bank surveillance photographs, he was not able to tell if Martin is the person depicted in

the surveillance photographs.[7]

During trial, the district court granted the government's request to have Martin

remove his eyeglasses, put on a cap, walk to the lectern in front of the jury and turn

_____

[7]Bruegge stated on cross-examination that there must be overwhelming similarity to make a positive identification. Here, he said that after comparing the pictures of Martin to the surveillance-video footage and photos taken from the bank he was unable to conclude that Martin was the bank robber depicted in the surveillance images. I concede, however, that Bruegge also stated on cross-examination that he was close to reaching that conclusion.

25

around. The baseball cap he put on was embossed with a Philadelphia Eagles logo, as was the hat worn by the robber.

The court told the jury that the cap "ha[d] been purchased as a prop by the [g]overnment for purposes of this case." Supp. app. vol. II, at 254. The government had two caps available at trial: one bearing a logo of the Philadelphia Eagles, the other with no logo. It is significant that none of the bank employees who testified said that the robber's cap had any logo on it. The government nevertheless pressed the court to require Martin to wear the cap with the Eagles logo, arguing: "it will be beneficial to the jury to see [Martin] in something that is as close as possible to what the bank robber wore." *Id.* at 252. However, if the jurors were actually comparing Martin's face to the face in the surveillance photos, having Martin wear the Eagles cap as opposed to a similar cap with no logo was certainly not "beneficial to the jury." It was, however, very beneficial to the government's chances of having the jurors conclude that Martin was the person in those photographs.

Displaying the defendant to the jury in this manner is, of course, normally permissible. *See Holt v. United States*, 218 U.S. 245, 252 (1910). However, the procedure was unduly suggestive under the circumstances here. Moreover, if the evidence from the surveillance photographs and identifying witnesses was as strong as the government and my colleagues suggest, this demonstration would not have been necessary. Yet, it was not only necessary, it had to be repeated.

26

During deliberations, the jury asked to see Martin once again wearing the cap. The court granted the jury's request and instructed Martin to put the cap on, and pull it down close to his eyes so that he would appear before the jury wearing the cap the same way the robber is depicted wearing an identical cap in the surveillance photographs.

The jurors had two days during the course of this trial to observe Martin. They had every opportunity to compare his face with that of the purportedly "clear" and "definite" images, in the numerous bank surveillance photographs. Yet, at perhaps the most important moment of the trial, Martin had to put on a cap identical to the robber's and pull it down close to his eyes before the jury could agree on an identification. Not only did this increase the likelihood of a misidentification based upon the similarity of the cap and general appearance, it obscured Martin's face.

## II.

In order to establish ineffective assistance of counsel, Martin must establish that counsel's efforts fell below an objective standard of reasonableness, and that the dereliction prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We presume, however, that "counsel's conduct might have been part of a sound strategy." *Thomas v. Varner*, 428 F.3d 491, 500 (3d Cir. 2005). The presumption is rebutted by "showing either that the conduct was not, in fact, part of a strategy or by showing that the strategy employed was not sound." *Id.* Where, as here, "the record does not explicitly disclose trial counsel's actual strategy or lack thereof . . . the presumption [of sound

27

strategy] may only be rebutted through a showing that no sound strategy posited by the [government] could have supported the conduct."[8]  *Id.*

A.

Martin first argues that trial counsel was ineffective for failing to file a motion *in limine* to preclude Detective Seifert from offering a lay opinion pursuant to Fed. R. Evid. 701.  The majority agrees with the government's claim that Detective Seifert only testified to show the circumstances leading up to Martin's arrest, and they therefore reject Martin's allegation of ineffectiveness because background evidence is usually admissible. According to the government, absent Seifert's explanation of why Martin was arrested, the jury might have concluded that it had not been told the whole story.  Although I would normally agree with this contention, I can not agree here because the disputed testimony was not offered for background.  It was offered to show that Detective Seifert identified Martin as the robber. In fact, the government undermines its own argument by its subtle concession that Detective Seifert's testimony "was not the most probative aspect of [its] *proof*."  Gov't Br. 30 n. 3 (emphasis added).  Evidence offered only for background would hardly constitute a "probative aspect of [the government's] proof."

---

[8] During the hearing of Martin's habeas petition, Martin did not ask counsel why he failed to file a motion *in limine* to limit Detective Seifert's testimony or why he elicited the testimony regarding Cook's out-of-court identification.

28

Moreover, even if the government only intended the testimony as background, the jury had no way of knowing of that limitation. Rather than giving an appropriate limiting instruction, the court told the jury: "And you can consider that also, there was other testimony—other *identification testimony* other than the eye witnesses, of course. There was the—particularly, the testimony of the arresting officer[]." Supp. app. at 338 (emphasis added). Thus, any attempt to dismiss Seifert's testimony as mere "background" ignores the record.

Furthermore, insofar as background evidence was appropriate at all, Detective Seifert merely had to explain that she went to the barbershop where Martin worked because she had information that someone who worked there resembled the person depicted in the surveillance photos. That would not only have addressed the government's concerns about apparent gaps in its case, it would have had the additional virtue of being a more accurate account of what happened. It would have done that without allowing Seifert to offer her opinion that Martin is the person in the surveillance photos. This would also have avoided the taint of allowing Detective Sefert to improperly offer her lay opinion that Martin was the person in the surveillance photographs.[9]

B.

---

[9] Indeed, the type of background provided by Detective Seifert's testimony is commonly stipulated to precisely because there is no dispute about how the defendant came to be arrested.

29

Fed. R. Evid. 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.

Although Detective Seifert's opinion that the surveillance photographs are pictures of Martin was rationally based on her perceptions, it was anything but "helpful."[10] Detective Seifert was no more qualified to compare Martin to the individual in the surveillance photographs than the jurors. "[W]herever inferences and conclusions can be drawn by the jury as well as the witness, the witness is superfluous; . . . a lay opinion is received because and whenever facts cannot be so told as to make the jury as able as [the witness] to draw the inference." 7 Wigmore on Evidence § 1917.8, at 10 (Chadbourne rev. 1978).

In *United States v. LaPierre*, 998 F.2d 1460 (9th Cir. 1993), an investigating officer informed the jury of his opinion that LaPierre was the person depicted in several bank surveillance photographs. On appeal, the Court of Appeals reversed the conviction in part because the investigating officer's testimony was not helpful and therefore inadmissible

---

[10]The third prong of the test for admissibility under Rule 701, that the testimony not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702," is clearly satisfied in this case. Fed. R. Evid. 701.

under Rule 701. "The jury . . . was able to view the surveillance photos . . . and make an independent determination whether it believed that the individual pictured in the photos was in fact [the defendant]." *Id.* at 1465. Thus, the officer's opinion testimony "ran the risk of invading the province of the jury and unfairly prejudicing [the defendant]." *Id.*

The court concluded that Rule 701 limits a lay witness's opinion regarding identification to situations where "the witness has had substantial and sustained contact with the person in the photograph" or "the defendant's appearance in the photograph is different from his appearance before the jury and the witness is familiar with the defendant as he appears in the photograph." *Id.* In "both [situations] there is reason to believe that the witness is more likely to correctly identify the person than is the jury." *Id.* Thus, absent circumstances not present here, "[l]ay opinion testimony of the type given by [Seifert] is of dubious value." *Id.*

My colleagues attempt to dismiss Martin's reliance on *LaPierre*, by suggesting that "the context was different," and stressing that there is no "ironclad rule against identification testimony from an arresting officer." Maj. Op. at 10. I agree that Rule 701 does not create an ironclad rule against a police officer offering identification testimony. However, dismissing *LaPierre* on that basis ignores the court's analysis.[11] The essence of

_____

[11]The majority states that "[p]olice officers may complete the story of the charged offense, absent prejudice or inadmissibility." Maj. Op. at 11. That testimony is certainly relevant during a suppression hearing for purposes of establishing probable cause to arrest, and that is the context the majority refers to. However, it is not permissible under Rule 701 for police officers to offer identification testimony by stuffing it into the Trojan

31

*LaPierre's* holding is that no lay witness, may offer an opinion identifying a defendant absent prior contact with the defendant, or other circumstances that suggest that the witness has a better basis to identify the defendant than the jury. There is no reason to create an exception for the lay opinion of police officers, and my colleagues offer none.

Indeed, given the danger that jurors may give a police officer's uninformed identification more weight than one based "only" on their own untrained eyes, it is particularly important to adhere to the limitations of Rule 701 when the lay opinion of identification is offered by a police officer. Lay opinion testimony identifying a defendant from surveillance photos is thus only admissible "if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury." *United States v. Towns*, 913 F.2d 434, 445 (7th Cir. 1990) (quoting *United States v. Farnsworth*, 729 F.2d 1158, 1160 (8th Cir. 1984)); *see also United States v. Jackman*, 48 F.3d 1, 4-5 (1st Cir. 1995) (collecting cases and finding such testimony admissible "at least when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification."). Here, Bruegge was the only expert qualified to give an opinion about Martin's identification. He was not able to identify Martin, despite his empirical approach and scientific methodology.

horse of background testimony.

32

## C.

The majority also concludes that defense counsel was not ineffective for eliciting testimony about the role Cook played in Martin's arrest because eliciting this information could have been part of counsel's trial strategy. The government contends that defense counsel asked Detective Seifert about Cook to establish that the detective was not able to identify Martin without Cook's help and thereby undermine Seifert's identification of Martin. That *post hoc* explanation strains credulity. Had Seifert never been allowed to say that she thought Martin was depicted in the surveillance photographs, it would not have been "necessary" to use Cook to try to limit the impact of Seifert's identification.

Rather than appropriately chipping away at the layers of identification, counsel added two additional layers himself by eliciting Seifert's opinion and Cook's out-of-court identification.

I am at a loss to understand the soundness of any defense strategy that would allow a police detective to impermissibly identify the defendant, and then elicit an out-of-court identification from the only person who knew Martin personally to undermine the detective's inadmissible identification.[12]

---

[12]The soundness of this strategy must also have escaped defense counsel because he never argued that Detective Seifert's testimony was undermined because she could not identify Martin without Edna Cook's help.

The bank employees' identifications were based on observations during a highly stressful robbery that lasted less than one minute, and afforded an opportunity to observe the robber's face that was substantially less than one minute. Moreover, common sense suggests that fear and the menacing presence of a sawed-off shotgun were formidable obstacles to the tellers' ability to focus on the robber's face during the few seconds that it was not obscured. That distraction and the minimal opportunity to observe explain why none of the tellers noticed the large contrasting eagle prominently embroidered on the front of the robber's cap; a logo that is exceedingly difficult to miss even if one does not follow professional football. Thus, it is not surprising that the jurors insisted on comparing Martin to the surveillance photographs themselves rather than rely on the testimony of the bank tellers.

Cook is different. Cook knew Martin, and her out-of-court identification was based on her casual observation of the surveillance photos. Thus, by allowing Detective Seifert to tell the jury that Cook had identified Martin from those photos, counsel's cross-examination of Seifert fortified the inherently unreliable identifications of the bank tellers. Accordingly, defense counsel's handling of Detective Seifert was not only ineffective, it was foolhardy.

D.

Of course, counsel's mistakes do not automatically result in relief under *Strickland*. Rather, Martin must show "that there is a reasonable probability that, but for counsel's

34

unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, Martin "need not show that counsel's deficient performance 'more likely than not altered the outcome in the case'—rather, he must show only 'a probability sufficient to undermine confidence in the outcome.'" *Jacobs v. Horn*, 395 F.3d 92, 105 (3d Cir. 2005) (quoting *Strickland*, 466 U.S. at 693-94)). That standard "is not a stringent one." *Jacobs*, 395 F.3d at 105.

My colleagues conclude that, given the evidence here, Martin would have been convicted even without Detective Seifert's testimony on direct and cross-examination. *See* Maj. Op. at 13. However, the remaining evidence was not sufficiently "clear and definite," to convince the jury of his guilt beyond a reasonable doubt after observing him during two days of testimony. Rather, despite the purportedly clear and definite surveillance photographs, the tellers' identifications, and two days of observation, the jury still had to interrupt deliberations to have Martin don the baseball cap in the manner of the robber for a second time. The dangers inherent in this procedure here should be obvious.

We clearly do not know what motivated the jurors to ask to see Martin with the cap a second time. Perhaps they concluded that Martin was the robber after observing him during the trial and comparing him to the surveillance photographs and merely wanted to assuage a lingering doubt of one of the jurors. Perhaps seeing Martin the second time only overcame substantial (and "reasonable") doubts when combined with Detective Seifert's lay opinion and Cook's out-of-court identification. We are left wondering.

35

*Strickland* does not require Martin to show that "but for" his attorney's error, he would not have been convicted. Given the sanctity of jury deliberations, that test could never be satisfied. Rather, *Strickland* only requires that Martin establish a reasonable likelihood that he would not have been convicted without his attorney's deficient performance. I think he has satisfied that burden.

### III.

Despite my colleagues' characterization of the evidence, this remains a very difficult case. As I said at the outset, I have stared at the only useful surveillance photo and compared it to Martin's arrest photo over and over and over again. I can understand the jury's difficulty. As I noted earlier, there is clearly a resemblance. That resemblance has caused me alternating degrees of doubt and certainty as I have compared the only useful surveillance photograph to Martin's arrest photograph. I have not been able to consistently conclude that the surveillance photograph is a picture of Martin, nor have I been able to consistently conclude that it is not a picture of him. Of course, I did not have the advantage of actually seeing Martin in person during two days of trial. However, that distinction would have been more convincing if the trial court had not made Martin put on a cap identical to the robber's and pull it down over his face during deliberations, and if the jury had not found it necessary to repeat the procedure.

I realize this precise point isn't argued here, but given the issues that are argued on appeal and the dangers inherent in identification testimony, the jury's apparent expression

36

of doubt despite their opportunity to compare Martin to the surveillance photos is relevant to the prejudice prong of Martin's *Strickland* claim.

## IV.

The majority emphasizes that the security guard's identification of Martin "was itself a basis for the jury's verdict." Maj. Op at 15. It clearly could have been. However, as I have explained, it is obvious from this record that the jury did not find that testimony as convincing as my colleagues do. My colleagues suggest that my concerns about the jury's apparent hesitancy and doubts are "speculative." Maj. Op. at 14. I admit that my analysis involves some degree of speculation. However, I submit that, since jury deliberations are necessarily shrouded in secrecy, some speculation is endemic in any inquiry under the prejudice prong of *Strickland*. Given this record and counsel's deficient performance, the speculation is not only warranted, it is compelled. Moreover, for reasons I have already explained, I fear that the verdict is also speculative and that the jury's speculation was resolved by the out-of-court identification of Edna Cook, and the opinion of Detective Seifert that defense counsel should have excluded under Rule 701.[13]

---

[13] *See United States v. Brownlee*, 454 F.3d 131, 142 (3d Cir. 2006) ("[M]istaken eyewitness identifications are responsible for more wrongful convictions than all other causes combined.") (Quoting A. Daniel Yarmey, *Expert Testimony: Does Eyewitness Memory Research Have Probative Value for the Courts?,* 42 Canadian Psychology 92, 93 (May 2001)). That conclusion is based on a study of 328 defendants who were ultimately exonerated based on subsequently available DNA testing. The study concluded that "'[E]yewitness evidence presented from well meaning and confident citizens is highly persuasive but, at the same time, is among the *least reliable forms of evidence.*'" *Brownlee*, 454 F.3d at 142 (brackets and italics in original).

I hope that I am wrong and that my colleagues are correct. I hope that Martin was convicted because he looks so much like the robber that the jurors were convinced beyond a reasonable doubt that he *is* the robber; and that he was not convicted because he resembles the robber when wearing an identical cap pulled down to obscure his face. However, because the jury no doubt considered Edna Cook's out-of-court identification, as well as Siefert's opinion, this verdict inspires more speculation than confidence. Since that evidence was only admitted because of defense counsel's ineffectiveness, I must respectfully dissent.