IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32298-0-III |
| | ) | (consolidated with 32343-9-III) |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KASEY JOSEPH FENTON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |
| In re the Petition for Relief from Personal | ) | |
| Restraint of: | ) | |
| | ) | |
| | ) | |
| Kasey Joseph Fenton. | ) | |

FEARING, J. — A jury found Kasey Fenton guilty of two counts of first degree assault with deadly weapon enhancements for stabbing Justin Arthur and Larry McDonald. Fenton asks this court to reverse his conviction and remand his case because the trial court improperly commented on the evidence and permitted two police officers to narrate video and photographic evidence. He also argues that the trial court erroneously instructed the jury on his defense of self-defense. If this court affirms his convictions, Fenton asks the court to vacate the legal financial obligations (LFOs) the

sentencing court imposed. Fenton argues there is insufficient evidence to support the sentencing court's finding that he has the present or future ability to pay those obligations. We affirm the convictions and the sentence.

FACTS

On May 13, 2011, Rachel and Kasey Fenton went to the city of Kelso to celebrate Rachel's sister's birthday. Because Kasey went fishing with his friend Shane Possinger earlier in the day, the Fentons drove separately. Around 7:00 p.m., Kasey joined Rachel and others at the bar, Splits, to celebrate the birthday. Rachel had at least six drinks that evening. Kasey split a pitcher of beer with his friend Possinger and drank seven or eight vodka red bulls.

Around closing time, Rachel and Kasey Fenton met a young woman as they paid their tab. The three of them went outside to smoke, where they discussed classes and their respective college majors. At one point, the conversation turned to religion and politics. Other strangers interjected comments that antagonized Rachel, Kasey, and the other woman. Eventually the conversation turned ugly. According to Rachel, the others insulted and bullied Kasey and her. "[T]here was quite a few F-bombs dropped back and forth," and Kasey called the others "Kelso's trash." Report of Proceedings (RP) at 711, 665.

The strangers arguing with the Fentons included Justin Arthur and Larry McDonald. Arthur and McDonald went to Splits for a guys' night out. Over the course

2

of the evening they drank heavily and played Big Buck Hunter, a video game. Around closing time, Justin Arthur and Larry McDonald called McDonald's girl friend to retrieve them. When they walked outside they noticed Kasey Fenton yelling and hollering at a group of people on the back steps of Splits.

The manager of Splits came outside and told Kasey Fenton to leave. Kasey recalls someone coming outside, but does not recall being asked to leave. He testified this may be because he lost 30 percent of his hearing in his left ear. Rachel told Kasey they needed to leave, but Kasey was preoccupied with the group bullying them and may not have heard her either. Despite the manager's instruction, Kasey continued to shout, "This is a crappy town, Podunk Kelso . . . Kelso sucks." RP at 231. Kasey boasted that Puyallup was a better town because Kelso is filled with rednecks. Rachel tried to calm him. Because Kasey did not respond to her, Rachel nudged, pushed, pulled, dragged, and directed him toward their motel.

The men jawing with Kasey Fenton followed Rachel and him into the bar parking lot. Rachel then started "really pulling and dragging on [Kasey]." RP at 648. While trying to pull Kasey by his collar toward her, Rachel either lost her balance and fell or Kasey knocked her down. A humiliated Rachel momentarily sat on the ground and then walked away.

Justin Arthur and Larry McDonald thought Kasey Fenton either pushed or punched his wife. The two yelled at Kasey, "[h]ey . . . you don't hit women," and ran

3

over to aid Rachel Fenton. RP at 252.

Another inebriated patron smoking at the back of Splits, Dustin Stout, saw things differently. Stout saw Rachel Fenton attempting to drag her husband back to the motel when she ripped his shirt, lost her balance, and fell. According to him, "[t]here wasn't anything malicious" to the behavior of Kasey Fenton. RP at 236. When he saw Justin Arthur and Larry McDonald run over to Rachel, Stout joined them in hopes of helping to resolve the misunderstanding.

When Justin Arthur and Larry McDonald reached the Fentons, Arthur saw Kasey stand over his wife and hit her. McDonald grabbed Kasey by the shoulders and spun him down onto his rear end. Kasey jumped up and cocked his fist to punch Arthur. Arthur swung first and punched Kasey on the mouth. Kasey fell down.

Rachel Fenton testified that she had her back turned to the melee. As she walked away, she heard feet running and slapping. When she turned around, her husband, Kasey Fenton, lay on the ground. While Kasey lay on the ground, another man "reared his leg back as far as he could and kicked Kasey dead in the face." RP at 651. Rachel ran back, yelling for the men to stop. Someone stopped her and warned, "[d]on't go over there. You're going to get hurt." RP at 652. Rachel pleaded, "Well, please go help him. He's getting beat." RP at 652. Several people came to the rescue of Kasey and stopped the melee.

4

Rachel Fenton yelled at Justin Arthur and Larry McDonald, telling them they were "pieces of shit." RP at 316. They explained they were trying to help. Since she did not want their help, Arthur and McDonald walked home by way of a McDonald's restaurant, hoping Larry McDonald's girl friend would pick them up on the way home or at the restaurant.

Rachel Fenton helped her husband Kasey up and propped him on her shoulder for the walk to the motel. Kasey bled from the mouth, was disoriented, and was missing a shoe, his shirt, and his keys. Rachel returned to the parking lot to retrieve Kasey's shoe and keys. She found the shoe but not the keys. Rachel went to find their friend Shane Possinger to help determine the extent of Kasey's injuries. She left Kasey smoking a cigarette along a curb by his truck. Kasey appeared shocked and angry when she left him.

Kasey Fenton realized he was missing his keys. Kasey peeked around the corner and saw the men who assaulted him were gone. So Kasey returned to the parking lot and walked in a zig-zag pattern before finding his keys. Hungry and thirsty, he headed back toward his truck and drove to the McDonald's restaurant.

As Kasey Fenton drove into the McDonald's restaurant parking lot, he saw Justin Arthur and Larry McDonald. Arthur and McDonald, on the one hand, and Fenton, on the other hand, disagree as to the events that followed. According to Arthur and McDonald, Fenton either hollered at the two to come closer or told the two, "I'm sorry for what

5

happened back there. I mean, I didn't really want anything to happen like that tonight, we were just having a good time." RP at 153. McDonald and Arthur approached the vehicle to tell him "[i]t's—alright. It's not a big deal," and asked him to leave. RP at 155. As they approached, Kasey swung the door open, lunged, and stabbed McDonald with a fillet knife. McDonald mistakenly thought Fenton used a taser and screamed to his friend "Oh, he's got a taser." RP at 156. Arthur tried to escape, but Fenton was faster. Fenton stabbed Arthur in the abdomen, puncturing his stomach and his intestines. Arthur fell to the ground in shock, and Fenton sped away.

According to Kasey Fenton, he opened his truck door when he saw Larry McDonald and Justin Arthur at the McDonald's restaurant and told them, "[h]ey, enough is enough, let's call it a good night." RP at 720. Before he could finish his sentence, the two stood before him. They cursed him, called him a wife beater, and repeatedly insisted he get out of his truck. One said, "[y]ou better get the F out of the truck right now" and then began hitting Fenton. RP at 722. Fenton stuck his left arm out as a defensive shield. With his right arm, he reached into his truck and felt around "subconsciously, [he] knew that there was something there. And so [he] . . . grabbed the fillet knife, and—and [he] had moved and poked." RP at 722-23. The next thing Fenton remembers is McDonald exclaiming, "[d]on't tase me, bro." RP at 723. Fenton told the men to leave. Arthur then started hitting Fenton on the top of the head. Fenton bent his head, extended his left arm to deflect the attack, and "swooped over and poked him." RP at 724. Fenton fled.

6

When Rachel Fenton returned to the site where the couple's truck had been parked, she found her husband missing. Because Kasey previously said he was thirsty, Rachel walked to the McDonald's restaurant to see if she could find him. In front of the McDonald's, Rachel noticed the two men who beat Kasey. Larry McDonald lifted his shirt and said, "[y]our boyfriend did this to us." RP at 656. Rachel asked, "[d]id what?" RP at 656. McDonald replied, "[h]e stabbed us." RP at 656. Justin Arthur then fell backwards. Rachel ran to help Arthur, but McDonald threw her back into the restaurant parking lot. Eventually the McDonald's restaurant night shift manager called 911.

When police arrived, they saw Larry McDonald and Justin Arthur bleeding, and Rachel Fenton putting pressure on Arthur's stomach to stem the bleeding. Shane Possinger appeared while police investigated, and Possinger called Kasey Fenton to learn of his location. Kasey told Possinger he was at exit 42 off Interstate 5. Officers went to that location and arrested Kasey.

Three buildings operated security videotapes the night of May 13, 2011: the bar Splits, the McDonald's restaurant, and a nearby Department of Licensing (DOL) building. These videos did not capture the stabbing of Justin Arthur and Larry McDonald, but captured some of the events leading to the stabbings.

PROCEDURE

The State of Washington charged Kasey Fenton with two counts of assault in the first degree, each with a deadly weapon enhancement.

7

At trial, the State played the videotapes from Splits and the DOL building during the testimony of police officer Ken Hochhalter. Officer Hochhalter occasionally correlated the time that events occurred on one video with events on another video, and he delineated the boundaries of the area captured by the cameras. Hochhalter also testified to the identity of individuals in the videos and described the events as they appeared to him. Hochhalter identified Kasey and Rachel Fenton when they appeared in the videos.

The State showed the DOL building video first. Kasey Fenton objected to Ken Hochhalter testifying during the playing of the video, but the trial court did not rule on the objection. The State presented the bar video second. Fenton did not object to Officer Hochhalter's testimony describing events in the second video.

The State presented the surveillance video from McDonald's restaurant last. Officer Brian Clark testified to its content. Kasey Fenton did not object to any portion of Clark's testimony.

Kasey Fenton claimed self-defense. The trial court instructed the jury on the law of self-defense using four instructions. Instruction 20, based on 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* (WPIC) 17.02 (3d ed. 2008) read:

> It is a defense to a charge of assault that the force used was lawful as defined in this instruction. The use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is about to be injured in preventing or attempting to prevent an offense against the person, and when the force is not more than is necessary. The person

8

using the force may employ such force and means as a reasonably prudent person would use under the same or similar conditions as they appear to the person, taking into consideration all the facts and circumstances known to the person at the time of and prior to the incident. The State has the burden of proving beyond a reasonable doubt that the force used by the Defendant was not lawful.

If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty as to this charge.

RP at 833.

Instruction 21, based on WPIC 17.04, read:

A person is entitled to act on appearances in defending himself. If he believes in good faith and on reasonable grounds that he is in actual danger of injury, although it afterwards might develop that the person was mistaken as to the extent of the danger. Actual danger is not necessary for the use of force to be lawful.

RP at 834.

Instruction 22, based on WPIC 17.05, read:

It is lawful for a person who is in a place where that person has a right to be and who has reasonable grounds for believing that he is being attacked to stand his ground and defend against such attack by the use of lawful force.

Notwithstanding the requirement that lawful force be "not more than is necessary," the law does not impose a duty to retreat. Retreat should not be considered by use—by you as a reasonably effective alternative.

RP at 834.

In addition to these instructions, the court gave the State's proposed jury instruction based upon WPIC 16.05 and *State v. Studd*, 137 Wn.2d 533, 973 P.2d 1049 (1999). Jury instruction 23 read:

9

> *Self-defense is an act that must be necessary.* Necessary means that, under the circumstances as they reasonably appeared to the actor at the time, (1) no reasonably effective alternative to the use of force appeared to exist and (2) the amount of force used was reasonable to effect the lawful purpose intended. *The right of self-defense does not permit action done in retaliation or revenge.*

RP at 834-35 (emphasis added). Kasey Fenton objected to the italicized portions of the instruction, which are not included in the standard WPIC 16.05. Defense trial counsel explained "in addition to the language that the State has added in reliance on case law, which we do object to[,] [t]he standard instruction does not relate specifically to self-defense, it just is the definition of 'necessary.' Given that that's not part of it, we'd object to that portion of the instruction." RP at 805.

The trial court also instructed the jury, in instruction 1, that it rendered no comment on the evidence in the case. The instruction read:

> Our state constitution prohibits a trial judge from making a comment on the evidence. It would be improper for me to express, by words or conduct, my personal opinion about the value of the testimony or other evidence. I have not intentionally done this. If it appeared to you that I have indicated my personal opinion in any way, either during the trial or in giving these instructions, you must disregard this entirely.

RP at 823-24.

The jury found Kasey Fenton guilty of two counts of first degree assault with deadly weapon enhancements for stabbing Justin Arthur and Larry McDonald.

10

LAW AND ANALYSIS

*Jury Instructions*

Kasey Fenton argues this court should reverse his convictions because jury instruction no. 23 constituted an improper judicial comment on the evidence, unduly emphasized the prosecution's theory of the case, and undermined the subjective component of the self-defense standard.

The State contends Fenton objected only to the last sentence of instruction 23, not the first sentence, and, therefore, we should not meet the merits of Fenton's argument. The first sentence declared that "[s]elf-defense is an act that is necessary." RP at 834. The final sentence instructed that "[t]he right of self-defense does not permit action done in retaliation or revenge." RP at 835. To raise an error for the first time on appeal, the State argues, Fenton must establish a manifest constitutional error.

Kasey Fenton argues he preserved assignments of error to both sentences, if not the entire jury instruction, because he objected to (1) the instruction as a whole, (2) the instruction's nonstandard language, and (3) language that the State added in reliance on case law. We agree with Fenton.

We need not address whether an objection to a portion of a jury instruction preserves error with regard to all sections of the instruction. Kasey Fenton's counsel told the judge that Fenton objected to language that the State added in reliance on case law. This objection spoke to the last sentence of jury instruction 23. Trial counsel also

11

objected to including a reference to self-defense in the definition of "necessary." The objection addressed the first sentence of instruction 23. Thus, Kasey Fenton need not show a manifest constitutional error.

The Washington State Constitution provides, "Judges shall not charge juries with respect to matters of fact, nor comment thereon, but shall declare the law." CONST. art. IV, § 16. This section prohibits a judge from conveying to the jury his or her personal attitudes toward the merits of the case or instructing a jury that questions of fact have been established as a matter of law. *State v. Levy*, 156 Wn.2d 709, 721, 132 P.3d 1076 (2006); *State v. Becker*, 132 Wn.2d 54, 64, 935 P.2d 1321 (1997). The judge's comment need not be express to be prohibited. *Levy*, 156 Wn.2d at 721. But the attitude of the court must be reasonably inferable from the nature or manner of the court's statements. *State v. Elmore*, 139 Wn.2d 250, 276, 985 P.2d 289 (1999). Washington courts have found a trial judge expressed an opinion on the merits of the case when the judge instructed the jury that an apartment was a building as a matter of law; where a special verdict form expressly stated that a youth program was "a school," a highly contested and critical fact; and where the court's instructions referenced the victims' birth dates, a critical element of the crime. *Levy*, 156 Wn.2d at 721; *Becker*, 132 Wn.2d at 65; *State v. Jackman*, 156 Wn.2d 736, 744, 132 P.3d 136 (2006).

The trial court has considerable discretion in the number and wording of jury instructions. *State v. Dana*, 73 Wn.2d 533, 536, 439 P.2d 403 (1968). Instructions are

12

sufficient if they correctly state the law, are not misleading, and permit counsel to argue

the case satisfactorily to the jury. *State v. Mark*, 94 Wn.2d 520, 526, 618 P.2d 73 (1980);

*State v. Ortiz*, 52 Wn. App. 523, 530, 762 P.2d 12 (1988). Nevertheless, it is error to

issue instructions that generate an "extreme emphasis in favor of one party." *Samuelson

v. Freeman*, 75 Wn.2d 894, 897, 454 P.2d 406 (1969); *Young v. Carter*, 38 Wn. App.

147, 149, 684 P.2d 784 (1984).

> Self-defense is a defense against charges of assault. RCW 9A.16.020 reads:

>> The use, attempt, or offer to use force upon or toward the person of
>> another is not unlawful in the following cases:
>> . . . .
>> (3) Whenever used by a party about to be injured, or by another
>> lawfully aiding him or her, in preventing or attempting to prevent an
>> offense against his or her person, or a malicious trespass, or other malicious
>> interference with real or personal property lawfully in his or her possession,
>> *in case the force is not more than is necessary.*

(Emphasis added.) Because the crime of assault involves an element of intent, proof of

self-defense may negate an element of the crime, namely the intent element. *State v.

Acosta*, 101 Wn.2d 612, 615, 683 P.2d 1069 (1984); *State v. Lewis*, 156 Wn. App. 230,

239, 233 P.3d 891 (2010).

> Instruction 23 read:

>> Self-defense is an act that must be necessary. Necessary means that,
>> under the circumstances as they reasonably appeared to the actor at the
>> time, (1) no reasonably effective alternative to the use of force appeared to
>> exist and (2) the amount of force used was reasonable to effect the lawful
>> purpose intended. The right of self-defense does not permit action done in
>> retaliation or revenge.

13

RP at 834-35.

Kasey Fenton argues instruction 23 amounted to an impermissible comment on the evidence because it indicated "the judge's belief—that the evidence proved [Kasey] acted unreasonably by attacking the others in retaliation and by using more force than necessary under the circumstances." Br. of Appellant at 14. Kasey also argues the instruction unduly emphasized the prosecution's theory of the case that he acted in retaliation and that his conduct was unnecessary. Along these lines, he contends the language overemphasized the objective prong at the expense of the subjective prong. We disagree.

Although the jury must consider the circumstances reasonably believed by the accused when assessing self-defense, the conduct of the accused must still be necessary in light of his reasonable belief. RCW 9A.16.020 employs the word "necessary." The first sentence of jury instruction 23 is not part of a Washington pattern jury instruction, and a trial court may be safer by limiting instructions to pattern instructions. Still, the second sentence of the instruction highlights Kasey Fenton's position that necessity is judged by his reasonable beliefs under the circumstances as they appeared to him. As a general rule, jury instructions are sufficient when, read as a whole, they accurately state the law, do not mislead the jury, and permit each party to argue its theory of the case. *State v. Teal*, 152 Wn.2d 333, 339, 96 P.3d 974 (2004).

14

In *State v. Studd*, 137 Wn.2d 533, 550, 973 P.2d 1049 (1999), our state high court reviewed the language in the last sentence of jury instruction 23 and expressly rejected both of Kasey Fenton's arguments. The court addressed whether the jury instructions erroneously stated the law of self-defense in six consolidated cases. In one of those cases, the court instructed the jury that "[t]he right of self-defense does not permit action done in retaliation or revenge." *Studd*, 137 Wn.2d at 550. The defendant argued the instruction improperly emphasized the State's theory of the case. Our Supreme Court disagreed, "find[ing] that the instruction correctly stated the law, and did not unfairly emphasize the State's theory of the case or, *in any way*, comment upon the evidence." *Studd*, 137 Wn.2d at 550 (emphasis added).

Kasey Fenton further contends that instruction 23 suggested that force is available only to those in real danger—that is, that self-defense can only be used in cases of actual necessity. We, however, review the challenged jury instruction within the context of the jury instructions as a whole. *Jackman*, 156 Wn.2d at 743. Instruction 21 states, "[a]ctual danger is not necessary for the use of force to be lawful." Clerk's Papers (CP) at 57. This instruction negates any adverse inference the jury could have possibly drawn from adding "[s]elf-defense is an act that must be necessary" to instruction 23. CP at 59.

Next Kasey Fenton argues that a correct instruction, such as instruction 21, cannot cure the problem caused by an incorrect instruction, such as instruction 23. In *State v. Kyllo*, 166 Wn.2d 856, 864-65, 215 P.3d 177 (2009), the trial court instructed the jury

15

that "Kyllo had to apprehend a greater degree of harm than is legally required before nondeadly force may be used in self-defense." 166 Wn.2d at 863. The State conceded the instruction misstated the law but argued a second jury instruction correctly stating the law cured any defect. Our high court disagreed because "[t]he jury instructions allowed the jury to apply an incorrect standard." *Kyllo*, 166 Wn.2d at 865.

Unlike in *Kyllo*, our trial court did not misstate the law in instruction 23. The court instructed the jury that "[s]elf-defense is an act that must be necessary." CP at 59. This is a correct statement of the law, since all self-defense is unmistakably rooted in the principle of necessity. *State v. Brightman*, 155 Wn.2d 506, 521, 122 P.3d 150 (2005).

The last sentence of jury instruction 23 is also supported by Washington cases. According to *State v. Studd*, 137 Wn.2d at 550 and *State v. Janes*, 121 Wn.2d 220, 240, 850 P.2d 495 (1993), the right of self-defense does not permit action done in retaliation or revenge.

We wonder if an accused might legitimately act in self-defense while also enjoying feelings of revenge or retaliation. In other words, an accused might entertain mixed motives. A foreign decision suggests one might be retaliating while lawfully protecting oneself. *Cotton v. State*, 4 Tex. 260 (1849). Still Kasey Fenton did not argue he had mixed motives when cutting Larry McDonald and Justin Arthur. So the question of mixed motives remains theoretical.

Finally, Kasey Fenton argues the trial court violated his Fourteenth Amendment due process rights by relieving the prosecution of its obligation to disprove self-defense. We recognize the State holds the obligation to disprove self-defense. *Kyllo*, 166 Wn.2d at 862. Our previous analysis in response to other arguments asserted by Kasey Fenton also establish that his constitutional rights were not violated. Jury instruction 20 specifically directed the jury that "[t]he State has the burden of proving beyond a reasonable doubt that the force used by the Defendant was not lawful." RP at 833.

We deny Kasey Fenton's invitation to usurp the broad discretion afforded to a trial court in crafting jury instructions.

*Video Narratives*

Kasey Fenton argues Officers Ken Hochhalter's and Brian Clark's testimony identifying individuals in surveillance videos, describing individuals' conduct, and relating events off camera constituted improper opinion testimony. Fenton contends the testimony prejudiced him by painting him as the aggressor during the earlier confrontation and thereby undermined his self-defense claim. The State argues Fenton failed to preserve this error for appeal but, if he did, the trial court properly permitted the testimony.

Whether we review an assignment of error and the standard of any review depends on whether Kasey Fenton preserved an assignment for appeal. This court does not review issues raised for the first time on appeal, absent a manifest error affecting a

17

constitutional right. RAP 2.5(a)(3); *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). The State played surveillance video from Splits, the rear entrance to the DOL building, and the McDonald's restaurant. Kasey Fenton objected to Officer Ken Hochhalter's "narration" of the Splits surveillance videos. RP at 409. He failed to object to any portion of Officers Hochhalter's or Brian Clark's respective testimony regarding the surveillance videos from the rear entrance of the DOL building or McDonald's restaurant. Fenton does not allege the admission of the testimony about the latter two videos constituted a manifest constitutional error. Thus, we do not review the alleged errors stemming from Hochhalter's or Clark's testimony regarding those surveillance videos.

The State also contends this court should refuse to review even the testimony of Ken Hochhalter to which Kasey Fenton objected, because the trial court did not rule on his objection. Nevertheless, RAP 2.5(a) allows an appellate court to consider an issue if the record shows that the issue was advanced to the trial court and the trial court was aware of and had opportunity to consider the issue. *Washburn v. Beatt Equip. Co.*, 120 Wn.2d 246, 291, 840 P.2d 860 (1992). If the appellant "advanced the issue below, thus giving the trial court an opportunity to consider and rule on the relevant authority, the purpose of RAP 2.5(a) is served and the issue is properly before this court." *Bennett v. Hardy*, 113 Wn.2d 912, 917, 784 P.2d 1258 (1990). The trial court had an opportunity to

18

consider Fenton's objection to Ken Hochhalter's testimony from Splits bar. We do not

penalize Fenton because the trial court did not rule on the objection.

This court reviews the trial court's decision to admit evidence for an abuse of

discretion. *State v. Fisher*, 165 Wn.2d 727, 750, 202 P.3d 937 (2009). A court abuses its

discretion when an order is manifestly unreasonable or based on untenable grounds.

*State v. Depaz*, 165 Wn.2d 842, 858, 204 P.3d 217 (2009); *State v. Quismundo*, 164

Wn.2d 499, 504, 192 P.3d 342 (2008).

ER 602 requires a witness to testify based on personal knowledge. A lay witness

like Officer Hochhalter may offer opinion testimony based on that personal knowledge if

it is (1) rationally based on the perception of the witness and (2) helpful to a clear

understanding of the testimony or the fact in issue. ER 701; *see State v. Hardy*, 76 Wn.

App. 188, 190, 884 P.2d 8 (1994), *aff'd State v. Clark*, 129 Wn.2d 211, 916 P.2d 384

(1996). Opinion testimony identifying individuals in surveillance photographs runs the

risk of invading the province of the jury. *State v. George*, 150 Wn. App. 110, 118, 206

P.3d 697 (2009) (quoting *U.S. v. LaPierre*, 998 F.2d 1460, 1465 (9th Cir. 1993)). But

such opinion testimony is admissible as long as there is some basis for concluding that

the witness is more likely to correctly identify the defendant from the photograph than is

the jury. *George*, 150 Wn. App. at 118. Opinion testimony may be appropriate when the

witness has had sufficient contacts with the person or when the person's appearance

before the jury differs from his or her appearance in the photograph. *George*, 150 Wn.

App. at 118. The opposite is usually true that an officer's identification testimony is not helpful to the jury if the officer has never seen the defendant in person. *LaPierre*, 998 F.2d at 1465.

The State presented no testimony that Officer Ken Hochhalter knew Kasey Fenton before May 13, 2011, and prior contact between the two is unlikely since Kasey Fenton lived in Puyallup. The State offers no reason to explain why Hochhalter is more likely to correctly identify Kasey Fenton or other actors in the video than the jury. Absent such explanation, the trial court abused its discretion in permitting the testimony.

Assuming the court improperly admitted the evidence, this court reviews whether the error was harmless. *George*, 150 Wn. App. at 119. The trial court's error is harmless if it is minor in reference to the overall, overwhelming evidence as a whole. *State v. Yates*, 161 Wn.2d 714, 764, 168 P.3d 359 (2007); *George*, 150 Wn. App. at 119. We conclude Officer Hochhalter's narration of the Splits video was harmless.

Officer Ken Hochhalter identified people throughout the video. Kasey Fenton's identity was never in dispute. Assuming it was, Eric Fielding, Dustin Stout, Larry McDonald, Justin Arthur, Luke Moore, Rachel Fenton, and Kasey all testified consistent with Officer Hochhalter's description of people in the video. In light of the overwhelming evidence of people's identities, the error in admitting Officer's Hochhalter's identification testimony was harmless.

20

Kasey Fenton also argues Officer Ken Hochhalter's description of actions recorded on the video constituted improper opinion testimony. He contends Hochhalter's testimony painted him as the aggressor during the earlier interaction outside the bar, which undermined his self-defense claim. Nothing in the record supports Fenton's argument. Hochhalter testified as to the identity of certain people in the video, described Rachel Fenton pulling on Kasey's shirt, and Justin Arthur running to where Kasey stood in the parking lot. Hochhalter did not depict Fenton as an aggressor. Even if Hochhalter had, it could not have prejudiced Fenton. The State argued that Kasey Fenton attacked Larry McDonald and Justin Arthur out of retaliation for the beating they gave him earlier. Whether Kasey was the aggressor in the first fight is irrelevant to whether Kasey later stabbed Arthur and McDonald in self-defense. Accordingly, any error in admitting Hochhalter's testimony is harmless.

*Legal Financial Obligations*

Kasey Fenton filed a personal restraint petition asking this court to terminate his LFOs because (1) he does not have the present or likely future ability to pay, (2) the LFOs cause an undue burden on him and his family, and (3) the record does not support the court's finding that he has or likely will have the future ability to pay.

Kasey Fenton did not object to the imposition of LFOs at sentencing. Under RAP 2.5(a), this court need not address this issue for the first time on appeal. Until our Supreme Court decides otherwise, the rule established by each division of this court is

21

that a defendant may not challenge a determination regarding his or her ability to pay LFOs for the first time on appeal. *State v. Duncan*, No. 29916-3-III, slip op. at 7-12 (Wash. Ct. App. Mar. 25, 2014) (citing RAP 2.5(a) and *State v. Kuster*, 175 Wn. App. 420, 425, 306 P.3d 1022 (2013)); *State v. Calvin*, 176 Wn. App. 1, 316 P.3d 496, 507-08, *petition for review filed*, No. 89518-0 (Wash. Nov. 12, 2013); *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d 492, *review granted*, 178 Wn.2d 1010, 311 P.3d 27 (2013). Fenton asks this court to make an exception, as the Court of Appeals did in *State v. Bertrand*, 165 Wn. App. 393, 404, 267 P.3d 511 (2011). But Bertrand had disabilities that might reduce her future ability to pay. *Bertrand*, 165 Wn. App. at 404. Nothing suggests Fenton has disabilities. On the contrary, he testified he was a fulltime college student and senior enlisted member of the Washington Army National Guard.

We decline to address the personal restraint petition for another reason. The State has not sought to enforce the LFOs. If it later does, Kasey Fenton may petition the court for remission under RCW 10.01.160(4), which states:

> A defendant who has been ordered to pay costs . . . may at any time petition the sentencing court for remission of the payment of costs or of any unpaid portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the defendant or the defendant's immediate family, the court may remit all or part of the amount due.

The denial or granting of *that* motion would warrant appellate review.

22

## CONCLUSION

We affirm Kasey Fenton's convictions. We deny his request for relief from the LFOs.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.